# In the United States Court of Federal Claims

No. 12-501C
Filed: January 31, 2013
Issued for Publication: February 21, 2013[1]

* * * * * * * * * * * * * * * *     *
ONE LARGO METRO, LLC,            *          Post-Award Bid Protest;
                                 *          Cross-Motions for Judgment
              Plaintiff,         *          on the Administrative Record;
       v.                        *          Technical Evaluation; Best
                                 *          Value Trade-Off Analysis; Bid
UNITED STATES,                   *          Preparation and Proposal
                                 *          Costs.
              Defendant.         *
                                 *
* * * * * * * * * * * * * * * *     *

**Joseph J. Dyer**, Seyfarth Shaw, LLP, Washington, D.C., for Plaintiff. With him were **Ronald Gart** and **Caroline A. Keller**, Seyfarth Shaw, LLP, Washington, D.C.

**Steven M. Mager**, Trial Attorney, Commercial Litigation Department, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him were **Jeanne F. Davidson**, Director, Commercial Litigation Department and **Stuart F. Delery**, Principal Deputy Assistant Attorney General, Civil Division. **Elizabeth H. Johnson**, Regional Counsel, General Services Administration, Washington, D.C., of counsel.

## O P I N I O N

**HORN, J.**

On August 8, 2012, Plaintiff, One Largo Metro, LLC (One Largo) filed a post-award bid protest in this court following award of an United States General Services Administration (GSA) contract to Fishers Lane, LLC (Fishers Lane),[2] instead of to

---

[1] This opinion was issued under seal on January 31, 2013. The parties were given the opportunity to propose redactions to the court. Neither party proposed any redactions. The opinion, therefore, is unsealed and issued for publication.

[2] Fishers Lane proposed using the Parklawn building in Rockville, Maryland, currently occupied by the United States Department of Health and Human Services (HHS), as the site for contract award. Fishers Lane is referred to interchangeably throughout the Administrative Record and the parties' briefs as Fishers Lane and Parklawn. The court

Plaintiff, pursuant to Solicitation for Offers, No. 08-011 (Solicitation). Plaintiff alleges that, but for Defendant's violation of statutes and regulations in awarding the lease to Fishers Lane, One Largo should have received the award. Plaintiff seeks $4,038,739.00[3] as monetary relief in the form of bid preparation and proposal costs. Plaintiff filed a motion for judgment on the Administrative Record and, in response, Defendant filed a cross-motion for judgment on the Administrative Record.

**FINDINGS OF FACT**

On July 16, 2008, Defendant issued the Solicitation[4] to lease space for HHS in Montgomery County or Prince George's County, Maryland, in order to consolidate several HHS locations, including the Parklawn building in Rockville, Maryland, into one. The Solicitation requested offers to rent office space to the government on a fixed price basis for a fifteen-year term. It also stated that modernization of HHS's current location at the Parklawn building could be a "potential solution" for the Solicitation, provided that the building complied with all requirements of the Solicitation once renovated. The Solicitation provided that "the lease will be awarded to the Offeror whose offer will be most advantageous to the Government and provides the best value to the Government, price and other award factors considered as set forth below."

Offers were to be evaluated on the basis of three technical factors: "Location," "Building Characteristics," and "Past Performance and Key Personnel." Each factor was further broken down into several sub-factors, as follows:

---

generally refers to the winning offeror as Fishers Lane, except when quoting from the Administrative Record and the briefs. Fishers Lane did not move to intervene in the above captioned case.

[3] Plaintiff alleges in its Complaint that a portion of these costs are contingent because vendors have agreed to discount their bills should Plaintiff fail to recover its costs from Defendant. Plaintiff also states in its Complaint that various other costs are estimates of the cost of their employees' efforts.

[4] The Solicitation was amended ten times. Several of the provisions at issue in this case were among the provisions amended. References in this opinion, therefore, are to the amended provisions.

Location

    1. Access to Existing Metrorail[5]
    2. Access to Amenities

Building Characteristics

    1. Number of Buildings
    2. Planning Efficiency and Flexibility[6]
    3. Quality of Building Architecture, Building Systems, and Construction[7]

Past Performance and Key Personnel

    1. Past Performance
    2. Key Personnel

The Solicitation ranked the importance of each factor and sub-factor:

Location is of equal importance to Building Characteristics and each is significantly more important than Past Performance and Key Personnel. The Location factor is comprised of two sub-factors, of which Access to Metrorail is significantly more important than Access to Amenities. Furthermore, Access to Metrorail is more important than any other sub-factor of either of the other two technical evaluation criteria. The Building Characteristics factor is comprised of three sub-factors, of which Number of Buildings is more important than Planning Efficiency and Flexibility and is significantly more important than Quality of Building Architecture, Building Systems and Construction. The Past Performance sub-factor is of equal importance to the Key Personnel sub-factor in the Past Performance and Key Personnel factor.

---

[5]   The Solicitation uses both the term "Access to Existing Metrorail" and "Access to Metrorail." The parties and many of the documents in the Administrative Record refer to this sub-factor as "Access to Metrorail." The court, therefore, refers to this sub-factor as "Access to Metrorail."

[6] The Solicitation refers to this sub-factor as "Planning Efficiency and Flexibility," whereas the Source Selection Plan refers to this sub-factor as "Planning, Efficiency and Flexibility." The court refers to this sub-factor as "Planning Efficiency and Flexibility."

[7] The Solicitation refers to this sub-factor as "Quality of Building Architecture, Building Systems, and Construction." At different points in the Administrative Record, this sub-factor is referred to as "Quality of Building Architecture, Systems and Construction," or "Quality of Architecture, Building Systems, and Construction." The court uses the Solicitation language, "Quality of Building Architecture, Building Systems, and Construction," unless directly quoting from another source.

Plaintiff contests Defendant's evaluation of the Access to Metrorail and Planning Efficiency and Flexibility sub-factors. Other technical sub-factors, however, are addressed briefly in this opinion because the offerors' overall ratings are relevant to the issue of whether Defendant properly used and conducted a trade-off analysis in awarding this contract.

The Solicitation stated that all proposed buildings "must be located within three (3) miles of a Metrorail station, as measured from the main entrance of the building to the nearest entrance of the transit facility by the driving distance on existing roads." Offerors that were located more than 2,500 walkable linear feet from a Metrorail station were required to provide shuttle service at their expense. Regarding the Access to Metrorail sub-factor, the Solicitation stated:

> In addition to providing a convenient means of commuting to and from work for HHS employees, access to Existing Metrorail is also important as it provides a useful method for employees to travel back and forth to other HHS facilities, during normal business hours. Distances will be measured from the main entrance of the building to the nearest entrance of the transit facility, in walkable linear feet (wlf) or, if it is more than 2,500 wlf [walkable linear feet], by the driving distance of existing roads. Buildings closer to an existing Metrorail station will be evaluated more highly.

For the other sub-factor under the Location factor, Access to Amenities,[8] the Solicitation provided that offers would be evaluated for amenities within the building, as well as amenities within one mile of the main entrance of the building closest to the entrance to the amenity. In a section labeled "Location Amenities," the Solicitation stated:

> Adequate eating facilities shall be located within 1 mile. The government encourages pedestrian access from the building location to the following basic services: fitness facilities, postal facilities . . . , restaurants, day care center, fast food establishments, dry cleaners, ATMs/banking services, convenience shops, card/gift shops, hair salons, automotive service stations, and drug stores.

In a separate section labeled "Access to Amenities," dealing specifically with the Access to Amenities sub-factor, the Solicitation indicated that offers would be evaluated for the quantity and variety of those same twelve categories of amenities. The Solicitation continued:

> If possible, these amenities should be available during early morning and evening hours, as well as operating during a normal business day. The

---

[8] In Amendment Number Eight to the Solicitation, issued on November 7, 2008, Defendant modified the language of two provisions, "Location Amenities" and "Access to Amenities." References regarding the Access to Amenities sub-factor are to Amendment Number Eight.

4

final evaluation will consider all of the available amenities and the offers will be scored based on quantity, variety, hours and proximity of such amenities. To be considered, restaurants and fast food establishments must be open for breakfast and lunch.  The best rating will be given to offers that provide the greatest variety and quantity of amenities with good hours of operation existing at the time of occupancy within the building or within 1,500 walkable linear feet of the building.

Under the Building Characteristics factor, the most important sub-factor was Number of Buildings, which was to be evaluated based on the number of buildings the offeror proposed, with a lower number of buildings, or buildings connected by a tunnel or covered walkway, to be given higher ratings.  With regard to the Planning Efficiency and Flexibility sub-factor of the Building Characteristics factor, the Solicitation stated:

Each building will be evaluated for overall planning efficiency.  This evaluation will include blocking and stacking plans, floor plate sizes, circulation factors, common area factors, rentable to usable ("r/u") square foot ratios, column spacing, column bay sizing, core configuration and placement, window mullion spacing, and other indicia of planning efficiency and flexibility .… The Government prefers solutions that offer integrated performance effectiveness with more efficiency and more flexibility for layout and more flexibility for future reconfigurations. Proximity and accessibility of the loading dock to the freight elevator and ability of the lobby design to accommodate integration of Government security requirements will also be considered.  Buildings which provide for more efficiency and flexibility will be more highly evaluated.

Also as part of the Building Characteristics factor, the Solicitation stated under the Quality of Building Architecture, Building Systems, and Construction sub-factor that the government would assess the "qualitative attributes of the building's architecture, massing, building systems, construction, and finishes."  For this sub-factor, "[t]he building systems that provide the most capacity, efficiency, reliability, and flexibility will be more highly rated."

Regarding the Past Performance sub-factor, the Solicitation stated that Defendant would evaluate the offeror's "past two (2) performances for development and ownership of projects of similar size, scope and complexity," with projects that are "more current and demonstrate a clear parallel" with this Solicitation being rated more highly. The Solicitation indicted, however, that "[f]ailure to submit information on Past Performance due to lack of experience will be evaluated by the Government as neutral." Under the Key Personnel sub-factor, the Solicitation indicated that Defendant would evaluate offerors' "entire design, construction, and management team," for qualifications and past performance on similar projects.  Moreover, the Solicitation stated, "[o]fferors whose key personnel provide the greatest qualifications, the most favorable past performance on similar projects, and a proven track record of working together on all three past successful projects will be more highly rated."

The Solicitation indicated that "[t]he Government intends to use a trade-off process in selecting the offer that is most advantageous." The Solicitation described the trade-off analysis as "a method of evaluating price and other factors as specified in the solicitation to select the offer that provides the best value to the Government." The parties have stipulated that the trade-off process "permits trade-offs among price and technical factors" and "allows the Government to accept other than the highest technically rated offer and other than the lowest priced offer." The Solicitation described the relationship between price and technical ratings for the purposes of Defendant's trade-off analysis, as follows:

> For this procurement, price is of significantly less importance than the combined weight of the technical factors; however, the degree of importance of price as a factor becomes greater as technical offers approach equality. Ultimately, if the highest technical offer is not the lowest priced offer, the Government will assess the value of the technical factors of an offer to reconcile the price and technical factors. The perceived benefits of the higher priced offer, if any, must merit the additional cost.

In connection with the Solicitation, Defendant issued a Source Selection Plan, detailing the process that would be used to assess offers.[9] Defendant indicated that it would employ a formal source selection procedure as outlined in Federal Acquisition Regulation (FAR) Subpart 15.3 (current through Feb. 7, 2013). A Source Selection Evaluation Board was established to evaluate offers. Three Technical Evaluation Teams were formed and each one was assigned to evaluate one of the three technical factors: Location, Buildings Characteristics, and Past Performance and Key Personnel. The Technical Evaluation Teams were tasked with performing a comprehensive, technical evaluation of each offer, for the assigned factor and sub-factors, including identifying strengths, weaknesses, and deficiencies. The Technical Evaluation Teams reported their findings to the Source Selection Evaluation Board, which was tasked with "[a]ssisting in evaluating proposals," "[r]ecording findings and ranking offers," "[s]ummarizing evaluation results of each offer," "[r]eaching a consensus decision," and "[p]reparing report(s) with the assistance of the TETs [Technical Evaluation Teams] on the evaluation results for recommendation to the SSA [Source Selection Authority]." The Source Selection Authority was responsible for selecting the proposal which represented the best value to the government. If the Source Selection Authority disagreed with the recommendation of the Source Selection Evaluation Board, he or she was required to document that disagreement, and provide supporting reasons for not following the Source Selection Evaluation Board's recommendation.

---

[9] On October 10, 2008, the initial Source Selection Plan was revised to conform with the various amendments which had been made to the Solicitation. The revised Source Selection Plan was approved by the Source Selection Authority on October 30, 2008. All references in this opinion are to the revised Source Selection Plan.

6

The Source Selection Plan elaborated on the trade-off analysis, which the Defendant could employ in selecting an offer. The Source Selection Plan repeated the language of the Solicitation, stating that price was of less importance than the technical factors, and continued:

> Ultimately, if the highest technical offer is not the lowest priced offer, the SSEB [Source Selection Evaluation Board] will assess and/or quantify the value of the technical factors of an offer to reconcile the price and technical factors. The perceived benefits of the higher priced offer, if any, must merit the additional cost and the rationale must be fully documented in the file. The SSEB [Source Selection Evaluation Board] and SSA have a degree of discretion in weighing the significance of the relationship between technical evaluation and cost differentials. Nonetheless, the SSEB and SSA may select an offeror that has a significantly higher price if the technical benefits of the offer are identified and support the conclusion that the technically superior offer is worth the significantly higher cost.

The Source Selection Plan also set forth the following adjectival ratings to be assigned to each technical factor and sub-factor:

- Superior: Many significant strengths; no significant weaknesses; some minor weaknesses.
- Highly Successful: Many significant strengths; few significant weaknesses; some minor weaknesses.
- Successful: Some significant and minor strengths and weaknesses, but meets the minimum requirements defined in the SFO [Solicitation].
- Marginal: Some strengths; many weaknesses. A marginally acceptable offer.
- Poor: Some or no strengths; many significant weaknesses. An offer that fails to meet the minimum requirements defined in the SFO and is unacceptable. Offerors receiving a "Poor" rating will be given the opportunity to meet the minimum requirements.

The Source Selection Plan also assigned a percentage value[10] to each technical factor and sub-factor for the purposes of evaluating offers:

---

[10] The Source Selection Plan also included a sample Consensus Scoring Sheet to be used by the Technical Evaluation Teams. The Consensus Scoring Sheet noted, regarding the percentage assignments for each sub-factor, "[t]he weights shown for each factor are included only to indicate the approximate relative value of each factor and will not be converted to an exact numerical value. The superiority of each factor, and of the offer as a whole, will be determined by a careful and complete evaluation of the strengths and weaknesses of that factor or offer and not by a strictly mathematical summation of grades."

Location – 45%

       1. Access to Metrorail – 35%
       2. Access to Amenities – 10%

Building Characteristics – 45 %

       1. Number of Buildings – 20%
       2. Planning Efficiency and Flexibility – 15%
       3. Quality of Building Architecture, Building Systems, and Construction – 10%

Past Performance and Key Personnel – 10%

       1. Past Performance – 5%
       2. Key Personnel – 5%

Additionally, the Source Selection Plan set forth a formula to evaluate the Access to Metrorail sub-factor[11] with the following criteria:

---

[11] The Solicitation provided that, for the purposes of the Access to Metrorail sub-factor, "[d]istances will be measured from the main entrance of the building to the nearest entrance of the transit facility. . . ." The Source Selection Plan, however, stated that distances should be measured "from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance." In the first round of protests before the United States Government Accountability Office (GAO) in this case, the GAO rejected a challenge to Fishers Lane's "Highly Successful" rating on the Access to Metrorail factor, noting that, while there were inconsistencies in how distance from Metrorail was measured, Defendant's calculations were explained in the record and the protestors failed to show that Defendant's calculations were unreasonable. Whether the distance from Metrorail was measured from the main entrance of the building "to the nearest entrance of the Metrorail station," or "to the turnstile of the nearest Metro entrance," would not affect the outcome of this case, as neither One Largo's "Superior" rating, nor Fishers Lane's "Highly Successful" rating on the Access to Metrorail sub-factor would change under either method of measurement. Moreover, Plaintiff has not raised this inconsistency in its Complaint, briefs, or at oral argument.

| Rating | Distance to Metro |
|---|---|
| Superior | Within 1,500 wlf, as measured in walkable linear feet (wlf) from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Highly Successful | More than 1,500 wlf but up to 2,500 wlf, as measured in walkable linear feet from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Successful | More than 2,500 wlf but less than one mile, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Marginal | More than one mile but less than two miles, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Poor | More than two miles but less than three miles, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |

Similarly, the Source Selection Plan included the following chart for evaluating the Access to Amenities sub-factor:

| Rating | Distance from Amenities | Amenities |
| --- | --- | --- |
| Superior | Within 1,500 wlf | At least 9 amenities from the following categories: restaurants, fast food establishments, day care centers, fitness facility, dry cleaners, bank/ATM, postal facility, convenience shops, cards/gift shops, hair salons, automotive service stations, and drug stores |
| Highly Successful | Within 2,500 wlf | At least 8 from the above amenity categories, to include restaurants and fast food establishments |
| Successful | Within 2,500 wlf | At least 5 from the above amenity categories |
| Marginal | Within 2,500 wlf | At least 3 items from the above amenity categories |
| Poor | More than 2,500 wlf but within one mile | At least 3 from the above amenity categories |

With regard to the Planning Efficiency and Flexibility sub-factor, the Source Selection Plan stated:

The Government prefers a building that contains the following features:
- floor plate sizes,
    - Efficient floor plate approximately 36,000 USF [useable square feet]
    - Rectangular in shape
- common area factors,
    - Useable to gross 75%
- column spacing,
    - Even, regular column spacing no less than 25'
    - Optimum 30' X 45'
- core configuration and placement
    - Interior, rectangular core containing standard building support elements, i.e., egress stairs, electrical and telephone closets, toilet rooms, janitor closet
    - 45' from core to window wall.
    - Z-type corridor at core
- window mullion spacing
    - 5' on center and each mullion wide enough to receive a 4" gypsum board partition.
- and other relevant indicia of planning efficiency and flexibility.
    - Column grid, window grid and ceiling grid all modular and related to one another on a 5' module.
    - 100 PSI live load throughout
    - Mix of ambient and direct lighting
    - Consistent 9' ceiling height; 10' for training and conference rooms.
    - Flexible infrastructure.
    - Generally, a rectangular floor plan.

As to the Number of Buildings sub-factor, the Source Selection Plan indicated that adjectival ratings would be based on the number of buildings, with "Superior" ratings given to offers that proposed one building.[12]

Regarding the Quality of Building Architecture, Building Systems, and Construction sub-factor, the Source Selection Plan included a long list of building features that would be assessed. The Source Selection Plan stated, "[b]uildings whose construction and architectural finishes meet or exceed industry standards for new, first-class construction in prime commercial office districts will be rated more highly."

---

[12] All five offerors proposed a single building, thus, as indicated below, all offers received a "Superior" rating on the Number of Buildings sub-factor.

Finally, the Source Selection Plan detailed how the Past Performance and Key Personnel sub-factors would be evaluated. For the Past Performance sub-factor, the Source Selection Plan indicated that the government would review three references and three case studies for each offeror, to "evaluate the offeror's Past Performance – including development, design, construction and property management – on projects of similar size, scope and complexity."  Regarding the Key Personnel sub-factor, the Source Selection Plan stated that "[t]he Government will evaluate the offeror's entire design, construction, and management team" for their qualifications and relevant experience.

The Source Selection Plan stated that, after the Technical Evaluation Teams completed their technical evaluations of all offers, the Source Selection Evaluation Board was to compare each proposal's final technical evaluation with its price.  If the offer with the highest technical evaluation also had the lowest price, that offer was to be recommended to the Source Selection Authority for contract award.  If not, however, the Source Selection Evaluation Board was responsible for deciding "whether the higher price proposed by the best technical proposal is justified by the differential in price and the technical merit as compared to the second ranked technical offer" by conducting a trade-off analysis.  The Source Selection Plan emphasized that the Source Selection Evaluation Board had "a degree of discretion" in conducting the trade-off analysis, and that "[t]he degree of difference in technical merit in terms of evaluation ratings or scores need not be proportional to the difference in price for a technically superior offer to be selected," but that the Agency must demonstrate "with reasonable certainty that the added value of the proposal is worth the higher price."  Once the Source Selection Evaluation Board made a decision, the Source Selection Authority, "in consultation with" the Contracting Officer, was required to "validate or question the recommendation of the successful offer," using independent judgment, and if appropriate, select another offer.  The Source Selection Plan stated that "[e]ach of these actions must be accompanied by a written narrative justification explaining why the selected offer represents the best value to the Government, or, if applicable, why the SSEB's recommendation is not approved."

Initially, Defendant received five offers in response to the Solicitation, from King Farm Associates, LLC (King Farm), Metroview Development Holdings, LLC (Metroview),[13] One Largo, University Town Center (University),[14] and Fishers Lane.  On February 26, 2010, after funding issues delayed the procurement, a revised Solicitation was issued, and the same five offerors responded in November 2010.  Each of those five offers was evaluated by the Technical Evaluation Teams and the Source Selection Evaluation Board.  After several rounds of discussions, revised proposals were

---

[13] Metroview is referred to interchangeably throughout the Administrative Record as Metroview and New Carrollton.  This opinion refers to the offeror as Metroview, unless directly quoting from the Administrative Record.

[14] University is referred to interchangeably throughout the Administrative Record as University, University Town Center, and UTC.  This opinion refers to the offeror as University, unless directly quoting from the Administrative Record.

submitted. Ultimately, Defendant requested, and received, final proposals from all five offerors.

As instructed in the Solicitation, the Contracting Officer performed a present value calculation and determined the net present value (NPV) per usable square foot for each of the five offers:

| Price Rank | Offeror | NPV | Difference from lowest NPV |
|---|---|---|---|
| 1 | King Farm | $23.82 | n/a |
| 2 | Fishers Lane | $24.74 | $0.92 |
| 3 | One Largo | $27.83 | $4.01 |
| 4 | University | $27.89 | $4.07 |
| 5 | Metroview | $27.95 | $4.13 |

The Technical Evaluation Teams reviewed the five offerors' final proposals and submitted their reports to the Source Selection Evaluation Board in December 2010. The Source Selection Evaluation Board then conducted its own review and issued its report on January 12, 2011. In conducting its evaluations, the Source Selection Evaluation Board stated that it was "guided by the SSP [Source Selection Plan] and SFO [Solicitation], the evaluation factors, the specific weights assigned to them, [and] the TET's findings and recommendations regarding the ratings and merits of the offer," as well as the Source Selection Evaluation Board's "own independent evaluation of the offers on a factor by factor basis." Before receiving any pricing information on the proposals, the Source Selection Evaluation Board assigned the following adjectival ratings on each technical sub-factor for each offeror:

| | Location (45%) | | Building Characteristics (45%) | | | Past Performance/Key Personnel (10%) | | Overall |
|---|---|---|---|---|---|---|---|---|
| | Access to Metrorail (35%) | Access to Amenities (10%) | Number of Buildings (20%) | Planning Efficiency (15%) | Quality of Architecture, Building Systems, & Construction (10%) | Past Performance (5%) | Key Personnel (5%) | |
| King Farm | Marginal | Highly Successful | Superior | Superior | Superior | Superior | Superior | Highly Successful |
| New Carrollton | Superior | Marginal | Superior | Superior | Superior | Neutral | Superior | Superior |
| One Largo | Superior | Successful | Superior | Superior | Superior | Neutral | Superior | Superior |
| Parklawn | Highly Successful | Superior | Superior | Highly Successful | Superior | Superior | Superior | Superior |
| UTC | Highly Successful | Superior | Superior | Superior | Highly Successful | Superior | Highly Successful | Superior |

The Source Selection Evaluation Board's technical sub-factor ratings largely matched those assigned to each offeror by the Technical Evaluation Teams, with several exceptions: 1) the Building Characteristics Technical Evaluation Team assigned University's offer a "Superior" rating for the Quality of Building Architecture, Building Systems, and Construction sub-factor, while the Source Selection Evaluation Board assigned a "Highly Successful" rating; 2) the Past Performance and Key Personnel Technical Evaluation Team assigned King Farm a "Highly Successful" rating for the Past Performance sub-factor, whereas the Source Selection Evaluation Board assigned a "Superior" rating; and 3) the Past Performance and Key Personnel Technical Evaluation Team assigned University a "Superior" rating on the Key Personnel sub-factor, while the Source Selection Evaluation Board assigned a "Highly Successful" rating. There were also some discrepancies between the numbers of significant and minor strengths and weaknesses assigned to various offerors on various sub-factors by the Technical Evaluation Teams and the Source Selection Evaluation Board, respectively.

Turning to the specific evaluations of the Source Selection Evaluation Board, regarding the Access to Metrorail sub-factor, the Source Selection Evaluation Board stated that the government calculated the distance from the main entrance of One Largo's building to the turnstiles of the nearest Metrorail entrance to be 525 walkable linear feet, and the distance from One Largo's building to the entrance of the nearest Metrorail to be less than 525 walkable linear feet. Therefore, Plaintiff was given a "Superior" rating on this sub-factor. For Fishers Lane, the distance from the proposed main entrance of the building to the entrance of the nearest Metrorail was calculated at 2,407 walkable linear feet, under the 2,500 walkable linear feet indicated as significant

in the Solicitation. Based on that measurement, Fishers Lane was rated "Highly Successful."

Under the Access to Amenities sub-factor, One Largo was assigned a "Successful" rating, as the Source Selection Evaluation Board found that six amenity categories were located within 2,500 walkable linear feet of the proposed building site. Fishers Lane received a "Superior" rating based on the presence of nine amenity categories within 1,500 walkable linear feet of the proposed building site.

With respect to the Planning Efficiency and Flexibility sub-factor, the Source Selection Evaluation Board indicated:

> For those Offers included in the competitive range, the final evaluation will also consider the test fits prepared by the Offeror's architect for a typical floor as certified by the Offeror. The Government prefers solutions that offer integrated performance effectiveness with more efficiency and more flexibility for layout with flexibility for future reconfiguration. The Government also prefers to minimize the travel distance between employees within facility(ies). The Government will also coordinate the percentage of usable office space that can be located within 45' of a windowed perimeter. Ratings will be based on strengths and weaknesses of offer.

The Source Selection Evaluation Board rated One Largo as "Superior" for the Planning Efficiency and Flexibility sub-factor, and found that it had four significant strengths, six minor strengths, no significant weaknesses, and four minor weaknesses. The Source Selection Evaluation Board indicated that One Largo's significant strengths were:

- 87% Common Area Factor exceeds the Source Selection Plan preference of 75%, resulting in a more efficient floor plate.
- 5' on center mullion spacing meets Source Selection Plan preference increasing daylight penetration and improving office views.
- 65,440 SF floor plate greatly exceeds the Source Selection Plan preference of 36,000 SF, limiting the amount of employee dispersion and increasing overall efficiency.
- In accordance with the SSEB rating table, a 1.117 Rentable to Usable Square Foot Ratio ("r/u") translates to a more efficient floor plate.

15

The Source Selection Evaluation Board indicated that One Largo's minor strengths were:

- Z-type corridor meets the Source Selection Plan preference.
- 8' 6" typical ceiling height exceeds the Solicitation standard, promoting a greater sense of openness.
- Interior core meets the Source Selection Plan preference, which translates to a more efficient floor plate.
- Column free areas increase ease of space planning.
- 80 pounds per square foot live load exceeds the Solicitation standard and allows for greater storage and workstation flexibility.
- The majority of the space consists of 30' x 45' column spacing which meets the Source Selection Plan's "optimum" spacing preference.

The Source Selection Evaluation Board noted that there were no significant weaknesses and identified the minor weaknesses in One Largo's proposal as:

- non-uniform column spacing, which negatively affects space planning and decreases the Government's flexibility in arranging systems furniture;
- non-rectangular floor plate, which does not meet the Source Selection Plan preference and decreases the overall efficiency as well as efficiency of space planning;
- non-rectangular core does not meet Source Selection Plan preference; and
- the distance from the core to the window wall exceeds the 45' Source Selection Plan preference in certain areas.

In its "Consensus Grade," the Source Selection Evaluation Board stated:

> The SSEB was split 4-1, however the majority concluded that the Offeror [One Largo] made significant design modifications that directly addressed technical deficiencies including column spacing, which was eliminated as a significant weakness, and a decrease in the R/U ratio which resulted in an improved rating. The SSEB members concurred that the offered site met and in many cases exceeded the SSP [Source Selection Plan] preference, and as a result assigned a **SUPERIOR** rating based on the abundance of significant strengths, and the elimination of their one (1) significant weakness. The dissenting opinion was that the final grade be Highly Successful due to the numerous minor weaknesses. However, per the SSP, agreement was reached because there was no significant difference in the evaluator's grades by more than a single adjective.

(emphasis in original).

16

Fishers Lane was rated as "Highly Successful" on the Planning Efficiency and Flexibility sub-factor, and the Source Selection Evaluation Board found that its proposal had five significant strengths, three minor strengths, one significant weakness, and four minor weaknesses. The Source Selection Evaluation Board indicated that the significant strengths in Fishers Lane's proposal were:

- 54,970 SF floor plate exceeds the Source Selection Plan preference of 36,000 SF, limiting the amount of employee dispersion and increasing overall efficiency
- 88% Common Area Factor exceeds the Source Selection Plan preference of 75%, resulting in a more efficient floor plate.
- 5' on center mullion spacing meets Source Selection Plan preference, increasing daylight penetration and improving office views.
- The interior core is less than 45' from the window wall, significantly increasing the natural light penetration within the building.
- 100 pounds per square foot live load meets the Source Selection Plan preference and exceeds the Solicitation standard, which allows for greater storage and workstation flexibility

The Source Selection Evaluation Board indicated that the minor strengths in Fishers Lane's proposal were:

- 8' 2" – 8' 10' typical ceiling height exceeds the Solicitation standard, promoting a greater sense of openness.
- In accordance with the SSEB rating table, a 1.13 Rentable to Usable Square Foot Ratio ("r/u") translates to a more efficient floor plate.
- Interior core meets Source Selection Plan preference, which translates to a more efficient floor plate.

The Source Selection Evaluation Board noted that the significant weakness in Fishers Lane's proposal was that the "20' X 24' and 19' X 20' column spacing is less than the SSP [Source Selection Plan] preference of 25', which negatively affects space planning," and identified the minor weaknesses in Fishers Lane's proposal as:

- non-rectangular floor plate does not meet the Source Selection Plan preference and decreases the overall efficiency as well as efficiency of space planning;
- non-uniform column spacing, which negatively affects space planning and decreases the Government's flexibility in arranging systems furniture;
- non-rectangular core does not meet Source Selection Plan preference; and
- U-shape corridor increases the travel time between offices, and negatively affects the overall efficiency of the building.

In its "Consensus Grade" the Source Selection Evaluation Board stated: "[t]he SSEB members concurred that while the offered site [Fishers Lane] meets many of the SSP preferences, the offer had at least one (1) significant weakness, which did not change as a result of the Offeror's December 17, 2010 Final Proposal Revision, and as a result assigned a **HIGHLY SUCCESSFUL** rating." (emphasis in original).

As to the Past Performance sub-factor, the Source Selection Evaluation Board assigned One Largo a "Neutral" rating, stating: "The Offeror did not provide any evidence of any relevant past performance, including past projects or references" because it was not available, "and will therefore be rated neutral." Fishers Lane, however, received a "Superior" rating on the Past Performance sub-factor based on three significant strengths and no minor strengths, significant weaknesses, or minor weaknesses. One Largo and Fishers Lane received identical ratings on the remaining technical sub-factors, earning "Superior" ratings on the Number of Buildings, the Quality of Building Architecture, Building Systems, and Construction, and the Key Personnel sub-factors.

The Source Selection Evaluation Board assigned "Superior" overall technical ratings to each of the offerors, except King Farm, which was rated "Highly Successful" overall. The Source Selection Evaluation Board then provided an explanation of each offeror's overall technical rating, based on the weighted factors assigned in the Source Selection Plan described above. The weighted factors meant that an offeror could receive a high percentage of one rating even if only receiving that rating on a low number of the sub-factors.

Adding up the percent values assigned to each technical sub-factor in the Source Selection Plan, the Source Selection Evaluation Board calculated that King Farm received a "Superior" rating on fifty-five percent of technical sub-factors, a "Marginal" rating on thirty-five percent, and a "Highly Successful" rating on ten percent. The Source Selection Evaluation Board stated: "While the Offeror received Superior ratings in five (5) subfactors, the SSEB [Source Selection Evaluation Board] decided that a marginal rating in the most heavily weighted subfactor (Access to Metrorail), lowers the overall rating to Highly Successful."

Metroview received a "Superior" rating on eighty percent of technical sub-factors, a "Marginal" rating on ten percent, a "Highly Successful" rating on five percent, and a "Neutral" rating on five percent. The Source Selection Evaluation Board found, "[t]his Offeror received Superior in four (4) categories including three (3) of the most heavily weighted categories. The Marginal rating received for Access to Amenities was only 10% of the overall rating and therefore does not justify lowering the rating to Highly Successful."

One Largo received "Superior" ratings on eighty-five percent of technical sub-factors, a "Successful" rating on ten percent, and a "Neutral" rating on five percent. In assigning One Largo an overall "Superior" rating, the Source Selection Evaluation

Board reasoned: "Five (5) of the subfactors are rated as Superior, including three (3) of the most heavily weighed subfactors."

Fishers Lane received a "Superior" rating for fifty percent of technical sub-factors, and a "Highly Successful" rating for the other fifty percent. The Source Selection Evaluation Board assigned Fishers Lane an overall "Superior" rating because "[t]he Offeror received five (5) out of seven (7) Superior subcategory ratings, while the other two (2) subcategories were rated as Highly Successful."

University received "Superior" ratings on fifty percent of technical sub-factors, and "Highly Successful" ratings on the other fifty percent. In justifying its overall "Superior" rating for University, the Source Selection Evaluation Board noted that "[t]he Offeror received ratings of Superior in four (4) out of the seven (7) subfactors. The remaining three (3) categories were rated as Highly Successful."

After evaluating the technical factors, the Source Selection Evaluation Board conducted a trade-off analysis, comparing price to the technical benefits of each offer, because the most highly rated technical proposal was not submitted by the lowest priced offeror, King Farm. The Source Selection Evaluation Board stated that, of the four offers that received an overall "Superior" rating, Fishers Lane had the lowest price. The next lowest priced "Superior" offer was One Largo, which proposed a price that was twelve percent higher than the Fishers Lane's proposal, and University and Metroview's proposals were priced higher than One Largo's proposal. Therefore, the January 12, 2011 Source Selection Evaluation Board Report concluded that One Largo, University, and Metroview were priced significantly higher than the lowest priced "Superior" offer from Fishers Lane, and, therefore, "should be eliminated in a trade off discussion." The Source Selection Evaluation Board then noted that King Farm put forth the lowest priced offer overall. Because the lowest priced offer was not the highest technically rated offer, the Source Selection Evaluation Board determined that a trade-off analysis was required with respect to King Farm and Fishers Lane.

The Source Selection Evaluation Board then conducted a comparison of King Farm and Fishers Lane on each technical factor and sub-factor, and concluded that the two offers "approached technical equality," thus price became more important in the analysis. The Source Selection Evaluation Board determined that, over the life of the lease, the Fishers Lane proposal would cost $39,000,000.00 more than King Farm's proposal. Although there initially was disagreement among Board members,[15] the

---

[15] The Source Selection Evaluation Board's January 12, 2011 Report indicated that the Source Selection Evaluation Board was initially divided on whether King Farm or Fishers Lane represented the best value to the government. The majority of Board members supported King Farm, finding that its distance from Metrorail was mitigated by its provision of shuttle service, and that Fishers Lane's weaknesses on the Planning Efficiency and Flexibility sub-factor did not warrant Fishers Lane's higher price, compared to King Farm. The members who supported Fishers Lane argued that Fishers Lane's advantage over King Farm on the Access to Metrorail sub-factor, as well as its overall higher technical rating, warranted its higher price, given that price was of

19

Source Selection Evaluation Board eventually decided, unanimously, that "the perceived benefits of Parklawn's [Fishers Lane's] offer and the value of Parklawn's technical factors that lead to its Superior rating were not significantly higher than those of King Farm and did not merit the additional cost of the net present value differential between its offer and that of King Farm." Based on this trade-off analysis, the Source Selection Evaluation Board stated that the King Farm offer provided the best overall value to the government and recommended that the Source Selection Authority select King Farm.

After the Source Selection Evaluation Board made its recommendation to the Source Selection Authority, Ms. Monica Sias,[16] expressed concerns regarding the Source Selection Evaluation Board's technical evaluation system and its award recommendation.[17] The Source Selection Authority, therefore, invoked her authority to order the re-evaluation of offers, asking the Source Selection Evaluation Board to take a second look at all of its technical ratings, as well as its trade-off analysis. On February 3, 2011, the Source Selection Evaluation Board adopted an Addendum to the Source Selection Evaluation Board's January 12, 2011 Report. The Source Selection Evaluation Board adopted only one change to its evaluation of technical sub-factors, regarding its analysis of parking[18] under the Quality of Building Architecture, Building Systems, and Construction sub-factor. This had no effect on any offerors' adjectival ratings on that sub-factor. The Source Selection Evaluation Board, however, also determined that, in assigning overall technical ratings to each offeror, the Source

significantly less importance than technical merit for this Solicitation. After further discussion, the Source Selection Evaluation Board unanimously decided that King Farm represented the best value to the government.

[16] As indicated below, Ms. Sias was not the final decision maker in this case, as Cathy Kronopolous, GSA's Regional Commissioner for the Public Buildings Service (PBS), National Capital Region, exercised her authority as the Head of Contracting Authority for PBS's National Capital Region to make the ultimate source selection determination.

[17] The Source Selection Evaluation Board's February 3, 2011 Addendum described the Source Selection Authority's concerns with the Source Selection Evaluation Board's January 12, 2011 Report, stating that Ms. Sias was uncomfortable with the fact that the Source Selection Evaluation Board recommended the only offer that was rated "Highly Successful," while all of the others were rated overall "Superior," because the Solicitation stated that price was significantly less important than technical ratings for the trade-off analysis.

[18] Parking was evaluated in the Source Selection Evaluation Board's January 12, 2011 Report, however, in the February 3, 2011 Addendum, the Source Selection Evaluation Board determined that King Farm merited an additional minor strength under the Quality of Building Architecture, Building Systems, and Construction sub-factor because of its "abundance of on-site parking (2,850 spaces)." The Source Selection Evaluation Board did not assign any further strengths or weakness to any other offeror related to parking.

Selection Evaluation Board had failed to account for the fact that, in accordance with the Solicitation, the Location factor and Building Characteristics factor were supposed to be equally weighted. The Source Selection Evaluation Board, therefore, decided that it "needed to evaluate each offer at the factor level in order to establish the overall rating," rather than at just the sub-factor level, as it had done in its January 12, 2011 Report. In addition, the Source Selection Evaluation Board reassessed its basis for assigning overall technical ratings, concluding that "in order for an offer to receive an overall technical rating of Superior, there must be no perceived Significant Weakness in any Factor," and even "any Significant Weaknesses in a sub-factor rating could have a downward influence on an overall rating." The Source Selection Evaluation Board assigned each offer a technical rating for each factor, as well as a new overall technical evaluation rating, although it left all of the sub-factor ratings unchanged from its January 12, 2011 Report. The Source Selection Evaluation Board's February 3, 2011 Addendum included a new chart reflecting this information, as follows:[19]

|  | Location Overall (45%) | Building Characteristics Overall (45%) | Past Performance/Key Personnel Overall (10%) | Final Overall Rating |
| --- | --- | --- | --- | --- |
| King Farm | Successful | Superior | Superior | Highly Successful |
| New Carrollton | Highly Successful | Superior | Highly Successful (5%)[20] | Highly Successful |
| One Largo Metro | Highly Successful | Superior | Superior (5%) | Highly Successful |
| Parklawn | Highly Successful | Highly Successful | Superior | Highly Successful |
| University Town Center | Highly Successful | Highly Successful | Highly Successful | Highly Successful |

The Source Selection Evaluation Board concluded in its February 3, 2011 Addendum that all five offers were technically equivalent, each deserving an overall rating of "Highly Successful." The Source Selection Evaluation Board included in the February 3, 2011 Addendum an explanation of each offeror's overall technical rating. The Source Selection Evaluation Board found that each of the offers had many strengths, but that each had at least one significant weakness on at least one sub-

---

[19] The chart included in the February 3, 2011 Addendum also included the technical ratings for each sub-factor. The sub-factor ratings did not change from the Source Selection Evaluation Board's original January 12, 2011 Report.

[20] The percentages for Metroview and One Largo were included in the chart with a footnote indicating that the "[o]ffers received a **NEUTRAL** rating for Past Performance subfactor, which was not considered." (emphasis in original)

factor, warranting a "Highly Successful" rating overall, rather than "Superior." Because the Source Selection Evaluation Board determined "the technical differences among the offers was negligible," the Source Selection Evaluation Board unanimously decided that the offers were technically equivalent, thereby, making price an important factor. Because King Farm was the lowest priced offer and had earned the same overall technical rating as the other four offers, the Source Selection Evaluation Board "determined that a cost/technical trade off discussion was unnecessary." The Source Selection Evaluation Board acknowledged that King Farm's offer had received only a "Successful" rating on the most important sub-factor, Access to Metrorail, but decided that this was King Farm's only significant weakness, and that each other offer also had at least one significant weakness. Thus, "[a]ny perceived benefits" of another offer "would not justify the price differential between that offer and that of King Farm." The Source Selection Evaluation Board, therefore, found for a second time, in its February 3, 2011 Addendum, that King Farm represented the best overall value to the government and recommended that Ms. Sias, as the Source Selection Authority, select King Farm as the winning offeror.

After receiving the recommendation of the Source Selection Evaluation Board, Ms. Sias issued a selection decision on February 16, 2011. She stated that the Source Selection Evaluation Board's findings regarding the technical strengths and weaknesses of each offer were consistent with the Solicitation's criteria. She also indicated that she agreed with the Source Selection Evaluation Board's technical ratings at the sub-factor level, as well as its recommendation to award the contract to King Farm. Ms. Sias, however, disagreed with the Source Selection Evaluation Board's sub-factor level ratings and overall technical ratings, and based her selection decision on a different analysis than that of the Source Selection Evaluation Board. Ms. Sias indicated that she did not find all five offers "to be equal in terms of their technical merit," although she found them "to be technically very close." Instead she found that One Largo and University deserved overall ratings of "Superior," while the other three offerors deserved overall ratings of "Highly Successful."

Regarding One Largo, Ms. Sias disagreed that its "Successful" rating on the Access to Amenities sub-factor should lower its overall rating for the Location factor, given that One Largo was rated "Superior" on the Access to Metrorail sub-factor, and "Access to Metrorail was supposed to be given considerably more weight than the Amenities subfactor" when assessing the Location factor as a whole. Ms. Sias concluded that One Largo deserved a "Superior" rating on the Location factor and, because it also had received "Superior" ratings on the Building Characteristics factor and Past Performance and Key Personnel factor, it should be given an overall rating of "Superior." With respect to University, Ms. Sias found that one significant weakness on the least heavily weighted sub-factor, Quality of Building Architecture, Building Systems, and Construction, was not enough to lower University's rating for the Building Characteristics factor, and that it had only a minor weakness relating to the Key Personnel sub-factor for the Past Performance and Key Personnel factor. Therefore, she raised University's rating on both the Building Characteristics factor and the Past Performance and Key Personnel factor to "Superior," and found that University should

22

earn an overall "Superior" rating. Ms. Sias agreed with the analysis contained in the Source Selection Evaluation Board's February 3, 2011 Addendum regarding each of the other three offers.

Although Ms. Sias changed One Largo's and University's overall ratings, she agreed with the Source Selection Evaluation Board's recommendation that King Farm represented the best value to the government. This was based on her conclusion that the "additional technical merit achieved by the One Largo Metro and the UTC [University] offers d[id] not warrant the additional cost of those offers." Ms. Sias indicated that all five offers were "technically very close," therefore she conducted a trade-off analysis and compared the two "Superior" offers, One Largo and University, against the lowest priced "Highly Successful" offer, King Farm. One Largo's offer was priced 16.8% higher than King Farm's offer, Ms. Sias noted, making it $90,404,890.00 more expensive over the life of the lease. She determined that the "only measurable technical differences" between One Largo's and King Farm's offers were in the Location factor, under which King Farm was rated more highly on the Access to Amenities sub-factor, while One Largo was rated more highly on the Access to Metrorail sub-factor. Ms. Sias reasoned:

> The issue then is whether or not the added technical benefit of being closer to a Metrorail station, although with fewer amenities, is worth paying an additional 16.8%, a significant cost increase that amounts to more than $90 million over the life of the lease. I find that it is not.

Ms. Sias' analysis with respect to University was similar to the One Largo analysis. She noted that University's offer was priced even higher than One Largo's offer, and that the differences between University's offer and King Farm's offer on the Access to Metrorail and Access to Amenities sub-factors were even smaller than the difference between King Farm and One Largo. Ms. Sias stated: "I do not find that the technical difference in the Location factor, with a Highly Successful overall to UTC [University] and Successful overall to King Farm merits the additional cost of $91,690,896." Thus, even though One Largo and University were rated more highly overall, Ms. Sias concluded that those two offers did not "have sufficient additional technical merit to warrant paying the additional costs," and that King Farm represented the best overall value to the government.

Pursuant to the Solicitation, the Source Selection Authority was assigned the responsibility to make the source selection decision in this case. In this case, however, Cathy Kronopolous, GSA's Regional Commissioner for the PBS, National Capital Region, exercised her responsibility as the Head of Contracting Authority for the Region and made the ultimate source selection determination. According to Ms. Kronopolous, she exercised her authority because the procurement at issue was the largest lease acquisition being undertaken by GSA at the time and had attracted a great deal of political interest. Ms. Kronopolous issued her first written selection decision on March 8, 2011, after having been briefed on both the Source Selection Evaluation Board's recommendation and the Source Selection Authority's decision, and after reviewing the

Solicitation, the Source Selection Plan, the Technical Evaluation Teams' reports, the Source Selection Evaluation Board's Report, Addendum, and Award Recommendation, as well as Ms. Sias' review. Ms. Kronopolous disagreed with both the Source Selection Evaluation Board's recommendation, and the Source Selection Authority's award decision, and decided to relieve the Source Selection Authority of her responsibility for the procurement.

In her March 8, 2011 decision, Ms. Kronopolous initially noted that the Source Selection Evaluation Board's sub-factor ratings did not change from its original January 12, 2011 Report to its February 3, 2011 Addendum, and that the Source Selection Authority also used the same sub-factor ratings as the Source Selection Evaluation Board. Ms. Kronopolous stated that she also "relied on the sub-factor ratings and narrative provided in the SSEB report [Source Selection Evaluation Board's January 12, 2011 Report]." Ms. Kronopolous determined, however, that the Source Selection Plan did not require rating each offer at the factor level, as the Source Selection Evaluation Board had done in its February 3, 2011 Addendum and the Source Selection Authority had done in her written decision. Therefore, Ms. Kronopolous "did not find it necessary to arrive at factor level ratings." Finally, Ms. Kronopolous agreed with the Source Selection Evaluation Board's overall technical evaluations in its original January 12, 2011 Report, "Superior" for all offerors, except King Farm, which was rated "Highly Successful" overall. She concluded, however, that "offerors with the same overall rating [were] not necessarily technically equal."

Ms. Kronopolous decided that, despite its higher price compared to King Farm, Fishers Lane represented the best value to the government. Ms. Kronopolous initially focused on comparing King Farm and Fishers Lane, the two lowest priced offerors. Ms. Kronopolous indicated that Fishers Lane's offer had received a "Superior" rating on fifty percent of the technical sub-factors, and a "Highly Successful" rating on the other fifty percent. King Farm's offer, on the other hand, had received a "Superior" rating for fifty-five percent of technical sub-factors, a "Highly Successful" rating for ten percent, and a "Marginal" rating for thirty-five percent. Ms. Kronopolous performed the following comparison of the Fishers Lane and King Farm proposals:

> King Farm and Parklawn [Fishers Lane] received identical ratings for Past Performance (5%), Key Personnel (5%), Number of Buildings (20%), and Quality of Building Architecture, Systems, and Construction (10%). King Farm received a rating of Superior for Planning and Efficiency and Flexibility (15%) while Parklawn received a rating of Highly Successful for that sub-factor. However, Parklawn received a rating of Superior for Access to Amenities (10%) while King Farm received a rating of Highly Successful for that sub-factor. Significantly, Parklawn received a Highly Successful rating for Access to Metrorail (35%) while King Farm only received a Marginal rating.

Although Fishers Lane and King Farm received "the same or similar adjectival scores on all technical sub-factors other than Access to Metrorail," Ms. Kronopolous

24

determined that the two proposals did not approach technical equality, as the Source Selection Evaluation Board and the Source Selection Authority had found. Instead, in her March 8, 2011 selection decision, Ms. Kronopolous concluded that Fishers Lane's offer was rated substantially higher on the most important sub-factor, Access to Metrorail, making it technically superior to King Farm's offer, as well as the best overall value to the government, despite its higher price compared to King Farm's offer.

Ms. Kronopolous then compared Fishers Lane's offer with University, One Largo and Metroview's offers. With respect to University, Ms. Kronopolous decided that the two offers were "essentially equal from a technical standpoint," thus University's significantly higher price made Fishers Lane's offer the better value. Regarding One Largo, Ms. Kronopolous acknowledged that One Largo had received Superior ratings for eighty-five percent of technical sub-factors, including the three most important sub-factors, Access to Metrorail (35%), Number of Buildings (20%), and Planning Efficiency and Flexibility (15%). Ms. Kronopolous also acknowledged that One Largo had received the highest percentage of "Superior" ratings of any of the offerors. She stated: "It is clear this offeror [One Largo] presented an attractive technical proposal. I would even go so far as to conclude that One Largo Metro was higher technically rated than Parklawn [Fishers Lane]." She stressed, however, that One Largo's net present value was calculated to be $4.01 higher per square foot than the lowest priced offer from King Farm, and $3.09 higher than the offer from Fishers Lane. This price difference convinced Ms. Kronopolous that Fishers Lane represented a better overall value to the government than One Largo. She concluded:

> While I am again mindful that price in this procurement was significantly less important that the combined weight of the technical factors, I am unable to find that the technical advantage represented by One Largo Metro [percentage increase over Parklawn] overcomes its cost difference when compared to Parklawn. I find that the Parklawn proposal represents a greater overall value to the Government than the One Largo Metro proposal.

(brackets in original).

Finally, Ms. Kronopolous found that Metroview's offer was rated "Superior" on eighty percent of sub-factors, a slightly lower percentage than for One Largo, but that Metroview's offer was priced even higher than One Largo's offer. Having determined that One Largo's technical superiority did not warrant the additional cost over Fishers Lane, Ms. Kronopolous found it "equally clear that Parklawn [Fishers Lane] should prevail over the New Carrollton [Metroview] proposal that is both lower technically rated and higher priced than One Largo Metro." Ms. Kronopolous, therefore, concluded in her March 8, 2011 selection decision that Fishers Lane represented the best value to the government, and directed the Contracting Officer to award the lease to Fishers Lane and notify all of the offerors of the selection decision. The Contracting Officer notified the offerors on March 10, 2011.

One Largo, King Farm, and Metroview each filed protests of Defendant's award to Fishers Lane with the GAO. The GAO consolidated the protests and stayed award of the lease while the protests were pending. Each of the three protestors raised numerous issues. King Farm challenged Defendant's evaluation of the Access to Amenities sub-factor in Ms. Kronopolous' March 8, 2011 selection decision, arguing that the Solicitation indicated that offers would be evaluated for the "quantity, variety, and proximity of amenities offered," but that Defendant had looked only at the number of amenity categories covered by each offeror. Plaintiff also maintained that, in her March 8, 2011 selection decision, Ms. Kronopolous merely recited offerors' ratings and prices, without weighing the specific strengths and weaknesses of each proposal, as required by the Solicitation. In particular, Plaintiff argued that Ms. Kronopolous did not sufficiently credit One Largo for its technical superiority in the Access to Metrorail sub-factor, as compared to Fishers Lane's proposal, which offered a building nearly five times as far from the nearest Metrorail station than One Largo's proposal.

On June 20, 2011, the GAO issued its decision. The GAO sustained the protests on two grounds: 1) Defendant's evaluation of the Access to Amenities sub-factor was inconsistent with the terms of the Solicitation's provision requiring that offers be evaluated for both quantity and variety of the amenities offered, and 2) Defendant's source selection decision dated March 8, 2011 was based upon a "mechanical comparison" of the offers' technical evaluations, and included "no evidence of any meaningful consideration by the HCA [Ms. Kronopolous] of the evaluated differences in the firms' offers."

With regard to the Access to Amenities sub-factor, the GAO found that the plain language of the Solicitation required Defendant "to evaluate both the overall number of amenities offered as well as the number of amenity categories," and, in particular, to evaluate the availability of eating facilities. Instead, Defendant had only counted amenity categories, which had the effect of "ignor[ing] the type of amenity being offered." Therefore, the GAO found that Defendant's "assignment of adjectival ratings based only upon how many amenity categories were offered was not reasonable," and that Defendant's error prejudiced the protestors.

Regarding Ms. Kronopolous' March 8, 2011 selection decision, the GAO stressed that source selection decisions "cannot be based on a mechanical comparison of the offerors' technical scores or ratings per se, but must rest upon a qualitative assessment of the underlying technical differences among competing offers." (citing The MIL Corp., B-294836, Dec. 30, 2004, 2005 CPD ¶ 29 at 8; Opti-Lite Optical, B-281693, Mar. 22, 1999, 99-1 CPD ¶ 61, at 5) (emphasis in original). The GAO found that Ms. Kronopolous had deviated from the Source Selection Evaluation Board's and Source Selection Authority's analyses and recommendations without explaining her rationale. "[W]ithout explaining the basis for her disagreement with the conclusions of lower-level evaluators," the GAO stated, Ms. Kronopolous "proceeded to make conclusory pronouncements concerning which proposal offered the best value to the government." The GAO found "no evidence of any meaningful consideration by the HCA of the evaluated differences in the firms' offers. Rather, the HCA's tradeoff assessment was

26

based upon a mechanical comparison of the percentage of superior and highly successful ratings assigned to each offer."

The GAO emphasized that the Source Selection Evaluation Board's January 12, 2011 Report included discussion of a number of differences between the various proposals on each technical sub-factor, which Ms. Kronopolous could have used to support her analysis and justify her decision to deviate from the Source Selection Evaluation Board's and Source Selection Authority's recommendations. "In the absence of a documented, meaningful consideration of the technical differences between the offerors' proposals, the HCA could not perform a reasonable tradeoff analysis." Therefore, the GAO concluded that Ms. Kronopolous "had no basis to determine that" Fishers Lane's proposal was more advantageous to the government than any of the other offerors' proposals.

The GAO recommended that Defendant: 1) re-evaluate the offers under the Access to Amenities sub-factor in accordance with the terms of the Solicitation, and 2) perform and document a new selection decision consistent with the GAO's decision. After the GAO issued its decision, Ms. Kronopolous followed the GAO's advice and re-evaluated the offers and, on August 24, 2011, issued a second written selection decision. In her August 24, 2011 selection decision, Ms. Kronopolous again adopted the findings of the Source Selection Evaluation Board's January 12, 2011 Report regarding all technical sub-factors, except Access to Amenities, which she reconsidered based on the GAO's findings. With respect to the Access to Amenities sub-factor, Ms. Kronopolous noted that the Source Selection Evaluation Board's evaluation was based upon the chart laid out in the Source Selection Plan, included above. Ms. Kronopolous explained that, using the Source Selection Plan's chart, the Source Selection Evaluation Board "counted the number of amenity categories located within 1,500 wlf and within 2,500 wlf, and assigned the adjectival rating that accorded with the SSP table." Ms. Kronopolous indicated that she began her analysis with the Source Selection Evaluation Board's findings, but that she also requested Defendant's "broker"[21] to "again research and document the existence, distance, and hours of operation for all amenities for each Offeror." Based on the "GSA broker's" research, she adjusted the Source Selection Evaluation Board's ratings to the extent she felt an adjustment was warranted. In addition, Ms. Kronopolous explained that, to take into account the number and variety of amenities offered by each offeror, she "considered not just the total number of amenities offered, but also the distribution of the quantity among the various amenity categories" mentioned in the Source Selection Plan. Finally, because the Solicitation emphasized eating facilities, Ms. Kronopolous paid "special attention to the number of eating establishments offered."

---

[21] "Broker" is the term used by Ms. Kronopolous in her August 24, 2011 selection decision.

Therefore, Ms. Kronopolous created a new chart to assess each offer's Access to Amenities proposal. She incorporated the following chart regarding One Largo into her August 24, 2011 selection decision:

| Category | Within 1,500 WLF | Within 2,500 WLF |
|---|---|---|
| Restaurants | | |
| Fast Food | 3 | 3 |
| Day Care | | |
| Fitness Facility | | |
| Dry Cleaners | | |
| Bank/ATM | | 1 |
| Postal Facility | | |
| Convenience Shop | 1 | 1 |
| Cards/Gift Shop | | 3 |
| Hair Salons | | 1 |
| Automotive Service Stations | | |
| Drug Stores | | |
| | | |
| Total Amenities | 4 | 9 |
| Total Categories | 2 | 5 |

Based on this new chart, Ms. Kronopolous found that, according to the Source Selection Plan, One Largo should receive only a "Successful" rating because it had at least five amenities from the listed categories within 2,500 walkable linear feet. Ms. Kronopolous added to her analysis, as follows:

> While there are a good number of amenities and a few food options within close proximity of the site, the site lacks a variety of additional amenities. This lack of variety limits the errands and personal tasks that employees can accomplish before and after work or during their lunch break. Compounding this is the fact that 3 of the total amenities are card/gift shops. Because of the lack of variety of amenities, taking the variety, quantity, hours and proximity of amenities into consideration, I find that One Largo Metro merits a rating of Successful for this subfactor.

Ms. Kronopolous included the following chart of Fishers Lane's offered amenities:

| Category | Within 1,500 WLF | Within 2,500 WLF |
|---|---|---|
| Restaurants | | |
| Fast Food | 4 | 5 |
| Day Care | | |
| Fitness Facility | | |
| Dry Cleaners | 1 | 2 |
| Bank/ATM | 2 | 2 |
| Postal Facility | 1 | 1 |
| Convenience Shop | 1 | 1 |
| Cards/Gift Shop | 1 | 1 |
| Hair Salons | 1 | 2 |
| Automotive Service Stations | 7 | 9 |
| Drug Stores | | |
| | | |
| Total Amenities | 18 | 23 |
| Total Categories | 8 | 8 |

Ms. Kronopolous stated that Fishers Lane should receive a "Highly Successful" rating on the Access to Amenities sub-factor, according to the Source Selection Plan, because it had at least eight amenities within 2,500 walkable linear feet. She added: "In fact, these same amenity categories are found within 1,500 wlf, offering even better access for employees." Ms. Kronopolous highlighted the number of eating establishments within 2,500 walkable linear feet of Fishers Lane's building, while indicating that she only gave credit for a few of the nine automotive service stations offered, because additional stations added only quantity, not quality. She concluded: "Because of the variety, quantity, hours and proximity of amenities, I find that Parklawn [Fishers Lane] merits a rating of Highly Successful approaching Superior for this subfactor."

Ms. Kronopolous rated King Farm "Highly Successful approaching Superior" on the Access to Amenities sub-factor, based on her finding that it offered twelve total amenities in eight amenity categories within 1,500 walkable linear feet, and sixteen total amenities in ten amenity categories within 1,500 walkable linear feet. Metroview received a "Marginal" rating, as Ms. Kronopolous found it offered only four total amenities in three amenity categories within 1,500 walkable linear feet, and no additional amenities within 2,500 walkable linear feet. Finally, Ms. Kronopolous rated University as "Superior" on this sub-factor, finding that University offered thirteen total amenities in eight amenity categories within 1,500 walkable linear feet, and twenty-nine total amenities in eleven amenity categories within 2,500 walkable linear feet. Although this put University in the "Highly Successful" category according to the Source Selection Plan, Ms. Kronopolous raised the rating to "Superior" based on the "significant variety" of amenities offered, and the large number of eating facilities within close proximity of the building.

After reassessing each offer under the Access to Amenities sub-factor, Ms. Kronopolous turned to performing a new best value analysis and making a new selection decision. The final sub-factor ratings she considered for each offeror were as follows:

| | Location | | Building Characteristics | | | Past Performance/Key Personnel | |
|---|---|---|---|---|---|---|---|
| | Access to Metrorail (35%) | Access to Amenities (10%) | Number of Buildings (20%) | Planning Efficiency and Flexibility (15%) | Quality of Building Architecture, Systems, Construction (10%) | Past Performance (5%) | Key Personnel (5%) |
| King Farm | Marginal | Highly Successful approaching Superior | Superior | Superior | Superior | Superior | Superior |
| New Carrollton | Superior | Marginal | Superior | Superior | Superior | Neutral | Highly Successful |
| One Largo Metro | Superior | Successful | Superior | Superior | Superior | Neutral | Superior |
| Parklawn | Highly Successful | Highly Successful approaching Superior | Superior | Highly Successful | Superior | Superior | Superior |
| University Town Center | Highly Successful | Superior | Superior | Superior | Highly Successful | Superior | Highly Successful |

Ms. Kronopolous, once again, adopted the specific strengths and weaknesses of each offer contained in the Source Selection Evaluation Board's January 12, 2011 Report, noting that these remained the same in the Source Selection Evaluation Board's February 3, 2011 Addendum. Factoring in her assessment of the Access to Amenities sub-factor, Ms. Kronopolous concluded that "the overall technical merits and ratings of the offers" had not changed from her first decision. Ms. Kronopolous did not include factor-level technical ratings. She again adopted the overall technical ratings contained in the Source Selection Evaluation Board's January 12, 2011 Report, which rated all of the offerors as "Superior" overall, except King Farm, which was rated "Highly Successful." Ms. Kronopolous stated that, heeding the advice of the GAO, her new trade-off analysis "look[ed] beyond the SSEB's adjectival ratings to identify, review and examine the strengths and weaknesses of each technical offer, and given those strengths and weaknesses, to determine the relative technical merits of the offers."

Ms. Kronopolous' August 24, 2011 selection decision discussed each technical sub-factor and compared all five offerors' technical ratings on each sub-factor. Starting with Access to Metrorail, Ms. Kronopolous stated that "One Largo is the strongest offer in this important sub-factor, [sic] I also find that New Carrollton [Metroview] (1,280 wlf), Parklawn [Fishers Lane] (2,407 wlf) and UTC [University] (2,350 wlf) are all within what GSA considers to be reasonable walkable distance to Metro." Ms. Kronopolous found that King Farm, on the other hand, was a "substantially greater distance" from the

Metro, a weakness which was not overcome by its provision of shuttle bus service. Regarding Access to Amenities, Ms. Kronopolous stated that, although University stood out in terms of quantity, the offers of University, Fishers Lane, and King Farm "are the strongest while One Largo Metro and New Carrollton [Metroview] are weaker due to the fewer amenity categories offered."

Ms. Kronopolous considered the three sub-factors under the Building Characteristics factor together, stating: "The SSEB rated all offerors Superior in all three categories, with the exception of Highly Successful ratings of Parklawn [Fishers Lane] for Planning Efficiency and Flexibility, and of UTC [University] for Quality of Building Architecture, Systems and Construction." Ms. Kronopolous found that "the lower rating of Parklawn for Planning Efficiency and Flexibility is justified by the building's tight column spacing that will affect future space planning and flexibility." Ms. Kronopolous noted, however, that "notwithstanding its adjectival rating, the layout of One Largo's building has non-uniform column spacing and a non-rectangular floor plate" and King Farm also had non-uniform column spacing. She determined that "these weaknesses are not of such severity as to detract from the overall quality of the offers, which were all technically very strong in the Building Characteristics category."

Finally, Ms. Kronopolous reiterated that the Source Selection Evaluation Board had rated all offerors as either "Superior" (King Farm, Fishers Lane, and University) or "Neutral" (Metroview and One Largo) on the Past Performance sub-factor, and as either "Superior" (One Largo, Fishers Lane, and King Farm) or "Highly Successful" (Metroview and University) on the Key Personnel sub-factor. Ms. Kronopolous found that, "[t]he high ratings for this category reflect the strength of the proposed development teams of all of the offerors, and the relatively minor differences which separate one offer from another."

Based on all of the technical sub-factors, Ms. Kronopolous found in her August 24, 2011 selection decision that the offers of Metroview, Fishers Lane, One Largo, and University were "all of very high quality, and as a whole approach technical equality." Ms. Kronopolous determined, however, that King Farm deserved a lower overall technical rating because of its significant weakness on the most important sub-factor, Access to Metrorail.

Ms. Kronopolous then explained in more detail why she concluded that King Farm did not approach technical equality with the other four offers. In particular, she noted that "GSA considers 2,500 wlf to be a reasonable walking distance from a Metro station to a federally occupied office building. If a location is further than this, it merits a lower technical rating." Ms. Kronopolous further explained the benefit of being within a reasonable walking distance of 2,500 walkable linear feet, stating:

> I find that being within reasonable walking distance to the Metro provides a measurable benefit to the Government. It will allow for easier, more convenient access for commuting, will allow HHS to reduce its carbon footprint, and will allow HHS employees quick and efficient access to the

Metrorail for business purposes, an important consideration for tenant agency.

Because King Farm was located farther than 2,500 walkable linear feet from a Metrorail station, outside of a reasonable walking distance, Ms. Kronopolous determined that it warranted only a "Marginal" rating on the Access to Metrorail sub-factor. Because King Farm was the only offer to receive such a low rating on the most important sub-factor, Ms. Kronopolous concluded that it was of a lower technical quality than the other four offers.

Turning to the four offerors with an overall "Superior" rating, Ms. Kronopolous concluded that "the significantly lower price of the Parklawn [Fishers Lane] offer makes it the most advantageous to the Government on a Best Value basis." She conducted a comparison of Fishers Lane's offer with each of the other offers, beginning with One Largo. The section of her August 24, 2011 selection decision labeled "Parklawn v. One Largo Metro" stated, in its entirety:

> The areas of technical difference between Parklawn [Fishers Lane] and One Largo Metro are in the following sub-factors: Access to Metro, Access to Amenities, and Planning Efficiency and Flexibility.
>
> One Largo Metro is less than 525 walkable linear feet to the Largo Town Center Metro Station while Parklawn is 2,407 wlf from the Twinbrook Metro Station. One Largo Metro therefore provides very easy access to Metro, while Parklawn is further away, but within the standard walkable distance to public transportation as established in other GSA procurements. Therefore, I find that at either One Largo or Parklawn, employees will be able to conveniently get to the Metro both for commuting from/to home, and to go to meetings at other HHS locations throughout the day providing a cost savings to the Government because providing other means of transportation to the Metro and other HHS locations will not be necessary.
>
> Parklawn offers a greater variety and quantity of amenities with better hours and closer proximity than One Largo. Looking at the total number of amenities and the number of amenity categories within 2,500 walkable linear feet, it is evident that Parklawn provides ample access to various eating establishments and better access to a variety of other employee service amenities. This will allow employees multiple food choices and the ability to conduct errands, as necessary, before and after work and during their lunch breaks. While One Largo Metro has a large total number of amenities, there is a lack of variety of other employee service amenities and a duplication of amenities within amenity categories.
>
> With respect to the building's planning efficiency and flexibility, Parklawn has a significant weakness with respect to its tight column spacing. This

will negatively affect space planning and flexibility in future lease years. One Largo Metro has larger column spacing; however, there are other aspects of the space planning at One Largo Metro that will have a negative effect on space planning and flexibility such as the non-uniform column spacing and the non-rectangular floor plate.

One Largo Metro is $3.09 per square foot more than Parklawn, and $51,156,702 more over the life of the lease.[22] The technical merit achieved by the proposal for One Largo Metro with respect to Access to Metro and Planning Efficiency and Flexibility is not worth the additional cost over Parklawn because: while One Largo Metro is closer to the Metro, the distance of Parklawn to the Metro is considered by GSA to be within easy walking distance; One Largo Metro also has Planning Efficiency and Flexibility limitations such that the difference between the two offers in this sub-factor is slight. Plus, Parklawn's rating on the Access to Amenities sub-factor exceeds that of One Largo Metro. The much greater expense of One Largo Metro for an offer that may have a small technical advantage over Parklawn does not represent the best value to the Government.

In a footnote in her August 24, 2011 selection decision, Ms. Kronopolous elaborated on what she considered a "reasonable walkable distance" and why she felt the difference between Fishers Lane and One Largo was not that great on the Access to Metrorail sub-factor:

In assessing the real world impact of this discrepancy in distance, I came to understand, from various internet websites, that the walking speed of the average adult is between 3 and 3.5 miles per hour. Using the lower number, it would take about 9.45 to 9.5 minutes to walk 2,500 walkable linear feet. Therefore, most employees will be able to walk the distance from Metro to the Parklawn [Fishers Lane] Building in less than 10 minutes. In my judgment a 10 minute walk will not be a major barrier preventing employees from commuting by Metro.

---

[22] Defendant's counsel stated at oral argument that the total cost of the lease would be $431,715,162.00 for Fishers Lane's proposal, while the total cost of the lease in One Largo's proposal would have been $482,871,864.00. Defendant arrived at those numbers by multiplying the total annual rent per square foot, by the total rentable square footage for each offer, dividing by twelve to get the rent per month, and then factoring in the months of free rent offered by each offeror, as well as commission credits. Those numbers do not appear in Ms. Kronopolous' decision or in the Administrative Record before the court.

After performing a similar comparison of Fishers Lane's proposal with the remaining offers, University, Metroview, and King Farm, Ms. Kronopolous again concluded in her August 24, 2011 selection decision that Fishers Lane represented the best overall value to the government. She emphasized that she was selecting the lowest priced offer among the four offerors that had received overall "Superior" ratings. Ms. Kronopolous specifically noted that the "cost difference ($51,156,702 over the life of the lease) between Parklawn [Fishers Lane] and One Largo Metro is too great a delta to overcome the minor benefits of closer access to the Metro, especially given that Parklawn does provide convenient walkable distance to a Metro." Ms. Kronopolous, once again, instructed the Contracting Officer to award the lease to Fishers Lane. On August 24, 2011, the lease was awarded to Fishers Lane and all other offerors were notified accordingly.

One Largo, King Farm, and Metroview again protested the award at the GAO. The GAO again consolidated the protests. The parties raised numerous challenges to Defendant's decision to award the contract to Fishers Lane. Specifically, Plaintiff raised the following issues: 1) Defendant failed to credit One Largo with its advantage in Access to Metrorail, 2) Defendant discredited One Largo's superiority in Planning Efficiency and Flexibility, 3) Defendant conducted its trade-off analysis in a manner inconsistent with the Solicitation, and 4) Defendant did not base the award on the Source Selection Official's independent judgment.

Responding to these protests, Ms. Kronopolous submitted a declaration to the GAO on October 6, 2011. In it, she explained the reasons for her decision to again award the lease to Fishers Lane. She stated: "I determined that the technical offers of New Carrollton [Metroview], Parklawn [Fishers Lane], UTC [University] and One Largo were all of very high quality, and as a whole, approach equality. Therefore, price became a more important factor." Responding directly to One Largo's argument that her trade-off analysis was wrong because she weighed price too heavily, Ms. Kronopolous stated:

> As made clear in my August 24 decision, and consistent with the SFO [Solicitation] and SSP, the degree of importance of price as a factor increases as technical offers approach equality. Since my evaluation determined that the OLM [One Largo Metro] and Parklawn [Fisher Lane] offers approached technical equality, the importance of price in the trade-off analysis properly and rationally became more important. To put it another way, I did not find that the cost difference could be justified, where the perceived difference in the value of the offers to the Government was not commensurate.

The GAO held two days of hearings in conjunction with this protest on November 1 and November 2, 2011, during which Ms. Kronopolous gave extensive testimony. When asked by Plaintiff's counsel at the GAO hearing about her statement in her August 24, 2011 selection decision that 2,500 feet is considered a reasonable walking distance, Ms. Kronopolous testified:

34

Q:      And what is beyond your footnote 6 that supports the notion that GSA considers 2500 feet to be a reasonable walking distance?

A:      In other solicitations, we use the same standard.  So it is something that we have used consistently to be beyond that you need a shuttle, so it's walkable.

Q:      If I understand you right, you say in other solicitations, GSA uses the same standard.  Is the same standard that anything within 2500 feet is a reasonable walking distance?

A:      That's the implicit, yes.  And that's how I'm interpreting it, yes.

Q:      You say "implicit."  In those other solicitations, does it expressly say that within 2500 feet is a reasonable walking distance?

A:      It doesn't use those words.  I don't know if it uses those words, frankly.

Ms. Kronopolous was later asked about the 2,500 feet standard by counsel for Metroview.  She responded:

Q:      Can you cite to any particular internal GSA policy or regulation such as the GSAR [General Services Administration Acquisition Regulations] or the GSAM [General Services Administration Acquisition Manual] that might have that measurement or standard in it that we could refer to?

A:      I don't know if it exists there.  I do know that it's -- I don't know if I would call it a policy, but it's definitely practice.  So if -- and I'm sure -- so it's a practice in the solicitations themselves.  I'm not aware of a document where it's captured.

Q:      So you're not aware of any particular written practice; am I correct?

A:      I'm not aware, yes.

In addition, Ms. Kronopolous was asked by Defendant's counsel to explain her evaluation of Plaintiff's and Fishers Lane's offers on the Planning Efficiency and Flexibility sub-factor.  She stated that, in conducting her trade-off analysis, she went beyond the adjectival ratings to look at the real differences between the two offers.

Q:      And when you did that process, was there any findings or conclusions you reached that affected how you did the trade-off analysis or affected your evaluation?

35

A:    To some extent, yes, because looking at the -- the technical components of planning and efficiency and flexibility, there's, like, five. Core factor, building floor plate, building column spacing, which is what the deficiency was for Fishers Lane.   So what I looked at was the assessment in the SSEB.  I looked at the technical evaluation write-up as well, and they did make a little distinction among themselves.  But overall, what I found was I agreed that there was a deficiency, there was a significant weakness for Fishers Lane in the column spacing.  So that was a fact, and it was valid, and it warranted the adjectival rating of highly successful.  That said, when I looked at the factors, all the factors for planning and evaluation, it wasn't a go/no-go for column spacing.  There were other factors under consideration.  And so four of them they met, plus there were additional considerations under an "other" category of which they had some strengths as well.  So I looked at the significant strengths, minor strengths, the significant weaknesses, the minor weaknesses.  And on the whole, I found that the differential from the adjectival rating did not necessarily help understand -- help present the true distinction.  And I thought that the true distinction was not as significant.  Given that this was, you know, like the third rated overall kind of importance for planning and the efficiency and flexibility and that they were able to achieve a great deal of those.

Q:    Was it your conclusion that there was no distinction?

A:    No, I think there's a distinction, yeah.  Clearly, there's a distinction. There was no significant weakness in One Largo, so that's -- absolutely.  I was just looking at, okay, looking beyond that, go deeper, what are the benefits, what are the technical advantages, what are the technical disadvantages of each offeror, and there was -- it was not as great of a distinction as the adjectival ratings implied.

Asked specifically about the two minor weaknesses that she had cited as "limitations" of One Largo's offer, but which she had failed to mention were shared by Fishers Lane's proposal, Ms. Kronopolous testified:

Q:    And can you explain the logic of where both had the same two weaknesses, why that would make the difference between -- the rationale for why that would make the difference between superior and highly successful only slight?

A:    Sure. I actually didn't approach it that way.  I didn't look at it that way.  So what I looked at was there were some minor weaknesses in One Largo's as well, and those were two examples.  So it was not to say that it negates every -- it kind of counterweights and gives more advantage to Fishers Lane.   So my slight advantage was much more about, even though I just acknowledged that there were some minor weaknesses

36

there, it was much more about the factor, if you look at the SFO [Solicitation] and all the criteria that you look at in the planning and efficiency and flexibility subfactor, that -- its -- the column spacing is still just one of a number of criteria that they were looking for, that we were looking for.

On December 5, 2011, the GAO denied the consolidated offerors' protests because the GAO found that Ms. Kronopolous' decision was not unreasonable. In terms of the Access to Metrorail sub-factor, the GAO emphasized that agency ratings "are merely guides for intelligent decisionmaking." The GAO found that Ms. Kronopolous had "looked beyond the adjectival ratings to determine the practical aspects of the distances from a Metrorail station." The GAO concluded, "[t]he HCA was not unreasonable in concluding, consistent with the SFO [Solicitation], that any distance shorter than 2,500 wlf was a reasonable walking distance." The GAO relied on the Solicitation's distinction between offers that were within 2,500 walkable linear feet and those that were farther away, which required that shuttle service be provided for any building beyond 2,500 walkable linear feet. The GAO reasoned that this distinction in the Solicitation "indicated that the SFO contemplated that distances shorter than 2,500 were reasonable walking distances." In addition, the GAO found that Ms. Kronopolous had recognized One Largo's superiority over Fishers Lane with respect to this sub-factor, and that she had concluded that One Largo's technical superiority "did not merit the additional cost to the government." In sum, the GAO concluded, "[a]lthough the protestors' disagree with the HCA's decision in this regard, this disagreement does not show that her judgment was unreasonable."

The GAO also rejected Plaintiff's argument that Ms. Kronopolous had minimized One Largo's superiority in Planning Efficiency and Flexibility relative to Fishers Lane's offer. Specifically, One Largo and Metroview both argued that Ms. Kronopolous was unreasonable in finding that the significant weakness in Fishers Lane's proposal, tight column spacing, was nearly matched by the minor weaknesses in One Largo's and Metroview's proposals, non-rectangular floor plans and non-uniform column spacing, because Fishers Lane's proposal also was found by the Source Selection Evaluation Board to have those exact same minor weaknesses. The GAO found that Ms. Kronopolous made no mention in her August 24, 2011 selection decision of the fact that Fishers Lane's proposal was found to have the same minor weaknesses as One Largo's and Metroview's proposals. Moreover, the GAO acknowledged that Ms. Kronopolous was not able to articulate an explanation for this omission in her testimony at the GAO hearing. The GAO, however, concluded that:

[T]he record does not demonstrate that the protestors were competitively prejudiced by the HCA's actions. The SSEB report assessed significant and minor strengths and weaknesses to each proposal, which the HCA reviewed and adopted in making her tradeoff and selection decision. . . . The weaknesses in dispute were only two among many criteria the SSEB considered under this subfactor, which itself was only weighted 15 percent.

37

Finally, the GAO addressed the protestors' arguments that Ms. Kronopolous had improperly considered price in her trade-off analysis. One Largo and Metroview had argued that Ms. Kronopolous gave undue weight to the lower price of Fishers Lane's proposal, while failing to give necessary weight to One Largo's and Metroview's technical superiority in the most important sub-factor, Access to Metrorail. The GAO found that Ms. Kronopolous had concluded in her August 24, 2011 selection decision that the proposals of One Largo, Metroview, and Fishers Lane were "not equal, but approaching technical equality," and thus price should be a greater factor in comparing those proposals. The GAO found Ms. Kronopolous' "consideration of the firms' respective proposed prices to be consistent with the SFO [Solicitation]." The GAO, therefore, determined that the protestors had failed to demonstrate that Defendant's decision was unreasonable and denied the protests. King Farm requested reconsideration of GAO's decision, but reconsideration was denied.

Thereafter, One Largo filed the present post-award bid protest in the United States Court of Federal Claims, claiming that Defendant's evaluation of the Access to Metrorail and Planning Efficiency and Flexibility sub-factors was arbitrary, capricious, and contrary to law. Specifically, Plaintiff alleges that Ms. Kronopolous' imposition of a 2,500 walkable linear feet standard as the basis for evaluating the Access to Metrorail sub-factor was inconsistent with the Solicitation's requirement that "buildings closer to an existing Metrorail station [be] evaluated more highly." (brackets in original). In addition, Plaintiff contends that Ms. Kronopolous' alleged discounting of Plaintiff's advantage over Fishers Lane in the Planning Efficiency and Flexibility sub-factor as "slight" on the basis of two minor weaknesses, which Fishers Lane's proposal also had been assigned, was arbitrary and capricious. Plaintiff acknowledges that Ms. Kronopolous was permitted to disagree with the Source Selection Evaluation Board's evaluation of offerors' technical ratings, but insists that she was required to set forth a rational basis for doing so at the time of her decision, and that any post hoc rationale is insufficient to support her decision. Plaintiff also alleges that its proposal was rated superior to Fishers Lane's proposal in the two most heavily weighted sub-factors, Access to Metrorail, worth thirty-five percent of the total, and Planning Efficiency and Flexibility, worth fifteen percent of the total, while Fishers Lane's proposal was rated more highly than Plaintiff's proposal on just the Access to Amenities sub-factor, which was only worth ten percent of the total. Given Plaintiff's superiority on the Access to Metrorail and Planning Efficiency and Flexibility sub-factors, One Largo argues, Defendant could not, consistent with the Solicitation's requirement that price be given "significantly less importance than the combined weight of the technical factors," conclude that Fishers Lane's proposal was more advantageous than Plaintiff's proposal. Plaintiff alleges, therefore, that Defendant's August 24, 2011 selection decision was arbitrary and capricious, and but for Defendant's error, Plaintiff should have been awarded the contract. Plaintiff has moved for judgment on the Administrative Record, and seeks reimbursement of bid and proposal costs in the amount of $4,038,739.00.[23]

---

[23] Plaintiff's Complaint references other forms of declaratory and monetary relief, but, at oral argument, Plaintiff's counsel stated that Plaintiff only is seeking bid preparation costs and not any other form of relief.

Defendant filed a cross-motion for judgment on the Administrative Record, and argues that Ms. Kronopolous' decisions with regard to the Access to Metrorail and Planning Efficiency and Flexibility sub-factors were reasonable. According to Defendant, Ms. Kronopolous' determination that Fishers Lane's proposal approached equality with Plaintiff's proposal, as well as her trade-off analysis, were consistent with the Solicitation. According to Defendant, the portion of the Solicitation requiring that proposals closer to Metrorail be rated more highly only dictated how the Agency was to evaluate the Access to Metrorail sub-factor, not how Defendant should conduct its trade-off analysis. Regarding the Planning Efficiency and Flexibility sub-factor, Defendant argues that Ms. Kronopolous' analysis was reasonable because she acknowledged Plaintiff's superiority on the technical sub-factor, but decided it was not sufficient to warrant the significant price difference between the two proposals. Moreover, Defendant argues that, even if Ms. Kronopolous' review of One Largo's technical merit on the Planning Efficiency and Flexibility sub-factor was flawed, Plaintiff was not prejudiced by Defendant's actions and, thus, is not entitled to any relief in this court. Finally, Defendant maintains that Ms. Kronopolous' trade-off analysis was reasonable. Citing <u>Windall v. B3H Corp.</u>, F.3d 1577, 1580 (Fed. Cir. 1996), Defendant states that even if an "alternative evaluation scheme" would yield a different result, that does not make the approach used by Ms. Kronopolous arbitrary, capricious, or contrary to law.

**DISCUSSION**

***Standard of Review***

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2012), which governs motions for judgment on the Administrative Record, the court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." <u>DMS All-Star Joint Venture v. United States</u>, 90 Fed. Cl. 653, 661 (2010) (citing <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2006)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. <u>See</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in <u>Scanwell Laboratories, Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. <u>See</u>, <u>e.g.</u>, <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir.) (citing to <u>Scanwell Laboratories, Inc. v. Shaffer</u> for its reasoning that "suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2004); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir.

2004) ("Under the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir.), <u>reh'g</u> and <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir. 2003); <u>Am. Fed'n of Gov't Emps. v. United States</u>, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("Congress intended to extend the jurisdiction of the Court of Federal Claims to include post-award bid protest cases brought under the APA by disappointed bidders, such as the plaintiff in <u>Scanwell</u>."), <u>cert.</u> <u>denied</u>, 534 U.S. 1113 (2002). The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes *all stages of the process of acquiring property or services,* beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" <u>Sys. Application & Techs., Inc. v. United States</u>, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1244 (Fed. Cir. 2010) (quoting 41 U.S.C. § 403(2))); <u>see</u> <u>also</u> <u>Distrib. Solutions, Inc. v. United States</u>, 539 F.3d 1340, 1345 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2008); <u>RAMCOR Servs. Grp., Inc. v. United States</u>, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (2)(D) (2006);[24] <u>see</u>

---

[24] The language of 5 U.S.C. § 706 provides:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;

also Orion Tech., Inc. v. United States, No. 2012-5062, 2013 WL 141740, at *3 (Fed. Cir. Jan. 14, 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("[T]he inquiry is whether the [government's] procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) (2000))); Bannum, Inc. v. United States, 404 F.3d at 1351; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically has addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A). See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of Title 5 of the Administrative Procedure Act ('APA'), 28

---

    (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

    (D) without observance of procedure required by law;

    (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

    (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000))); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Alabama Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform a meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir. 2007), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court has also cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340; Textron, Inc. v. United States, 74 Fed. Cl. at 285; Labat-Anderson Inc. v. United States, 50 Fed. Cl. 99, 106 (2001); Emery Worldwide Airlines, Inc. v. United States, 49 Fed. Cl. 211, 222, aff'd, 264 F.3d 1071 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001); Dynacs Eng'g Co. v. United States, 48 Fed. Cl. 614, 619 (2001); Ellsworth Assocs., Inc. v. United

States, 45 Fed. Cl. 388, 392 (1999), dismissed, 6 F. App'x 867 (Fed. Cir. 2001). The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts;' a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999); C.A.C.I., Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983); and Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004)).

Furthermore, to prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). Recognizing the two-step analysis of bid protest cases, the Federal Circuit has stated that:

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999) (citation omitted in original); see also Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331; Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Myers Investigative & Sec. Servs., Inc. v.

43

United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances. This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . . To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); and Data Gen. Corp. v. Johnson, 78 F.3d at 1562)); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1331 ("To establish prejudice, the claimant must show that there was a 'substantial chance it would have received the contract award but for that error.'" (quoting Statistica, Inc. v. Christopher, 102 F.3d at 1582)); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d at 1370 (using the "substantial chance" standard); OMV Med., Inc. v. United States, 219 F.3d at 1342 (invoking a "reasonable likelihood" of being awarded the contract test); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406, 412 (2007) (using a "substantial chance" test); Park Tower Mgmt., Ltd. v. United States, 67 Fed. Cl. 548, 559 (2005) (using a "substantial chance" test). But see Weeks Marine, Inc. v. United States, 575 F.3d at 1362 (holding that a pre-award bid protest claimant must show "'a non-trivial competitive injury which can be redressed by judicial relief . . . .'").

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."); see also R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971)); see also HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011); Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 523 (2003) (quoting Honeywell, Inc. v. United States, 870 F.2d at 648 (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)).

As stated by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. ITC, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion otherwise not in accordance with the law" standard, the Federal Circuit stated that "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Gulf Grp. Inc. v. United States, 61 Fed. Cl. 338, 351 (2004) ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); ManTech Telecomms. & Info. Sys. Corp. v. United

States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. at 392 ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))).

> According to the United States Court of Appeals for the Federal Circuit:
>
> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 617 F.2d 590, 598 (Ct. Cl. 1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d at 958-59; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Grumman Data Sys. Corp. v. Widnall, 15 F.3d 1044, 1046 (Fed. Cir. 1994); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir), reh'g denied (Fed. Cir. 2002).

> Similarly, the Federal Circuit further has indicated that:
>
> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals. See Compubahn, Inc. v. United States, 33 Fed. Cl. 677, 682-83 (1995) ("[T]his court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation.") (footnote omitted)); see also Textron, Inc. v. United States, 74 Fed. Cl. at 286 (in which the court considered technical ranking decisions are "'minutiae of the procurement process'" not to be second guessed by a court (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996))). This is because "[t]he evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations." Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (citing E.W. Bliss Co. v. United States, 77 F.3d at 449); see also Unisys Corp. v. United States, 89 Fed. Cl. 126, 142 (2009) (holding that an agency's "exercise of such technical judgment and expertise . . . . is entitled to the greatest possible deference under E.W. Bliss"); Dismas Charities, Inc. v. United States, 61 Fed. Cl. 191, 203 (2004) ("The decision as to whether an offeror should have scored a 3, 4, or 5 on any question is properly left to the discretion of the agency."). The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis and, therefore, were arbitrary or capricious, in which case, courts have a role to review and instruct. See, e.g., WorldTravelService v. United States, 49 Fed. Cl. 431, 441 (2001) ("Therefore, this court's main task is to ensure that the [agency] examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (internal citations omitted))).

The amount of discretion afforded the contracting officer is greater in some circumstances as compared to others. For example, in a negotiated procurement, contracting officers are generally afforded greater decision making discretion, in comparison to their role in sealed bid procurements. See Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("Because the bid protest at issue here involved a 'negotiated procurement,' the protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests." (citations omitted)); see also Hayes Int'l Corp. v. United States, 7 Cl. Ct. 681, 686 (1985) ("It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." (citing Sperry Flight Sys. v. United States, 212 Ct. Cl. 329, 339-40, 548 F.2d 915, 921 (1977))).

The Federal Circuit has explained that procurement officials have an even greater degree of discretion when it comes to best value determinations, as compared to negotiated procurements. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (noting that because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also Banknote Corp. of Am. Inc. v.

<u>United States</u>, 365 F.3d at 1355 ("It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing <u>TRW, Inc. v. Unisys Corp.</u>, 98 F.3d 1325, 1327-28 (Fed. Cir. 1996))); <u>Am. Tel. and Tel. Co. v. United States</u>, 307 F.3d 1374, 1379 (Fed. Cir. 2002), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u> (Fed. Cir.), <u>cert.</u> <u>denied</u>, 540 U.S. 937 (2003); <u>E.W. Bliss Co. v. United States</u>, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government. <u>See</u> <u>Lockheed Missiles & Space Co., Inc. v. Bentsen</u>, 4 F.3d 955, 958 (Fed. Cir. 1993); <u>cf.</u> <u>Widnall v. B3H</u>, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is 'grounded in reason... even if the Board itself might have chosen a different bidder')…."); <u>Lockheed Missiles & Space Co. v. United States</u>, 4 F.3d at 958; <u>Burney v. United States</u>, No. 12-67C, 2012 WL 1632353, at *6 (Fed. Cl. May 9, 2012) ("We give a high level of deference to an agency's evaluation of proposals and best value determinations, recognizing the agency's expertise in procurement matters and application of regulations. <u>See</u> <u>CHE Consulting, Inc. v. United States</u>, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing <u>E.W. Bliss Co. v. United States</u>, 77 F.3d 445, 449 (Fed. Cir. 1996)). An agency's action will be upheld unless the protestor can show that the agency's action was without a rational basis. <u>Impresa Construzioni Gemo. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1333 (Fed. Cir. 2001)."), <u>aff'd</u>, No. 2012-5088, 2012 WL 6118824 (Fed. Cir. Dec. 11, 2012); <u>Akal Sec., Inc. v. United States</u>, 103 Fed. Cl. 310, 329 (2011) ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting <u>E.W. Bliss Co. v. United States</u>, 77 F.3d at 449)); <u>Blackwater Lodge & Training Ctr., Inc. v. United States</u>, 86 Fed. Cl. 488, 514 (2009).

When the contracting officer's discretion grows, so does the burden on the protestor. As noted recently in <u>D & S Consultants, Inc. v. United States</u>:

> The protestor's burden becomes more difficult the greater the degree of discretion vested in the contracting officer. <u>DynCorp Int'l v. United States</u>, 76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting officer a "breadth of discretion;" "best-value" awards afford the contracting officer additional discretion. <u>Id.</u> Therefore, in a negotiated, best-value procurement, the "protestor's burden is especially heavy." <u>Id.</u>

<u>D & S Consultants, Inc. v. United States</u>, 101 Fed. Cl. 23, 33 (2011). <u>D & S Consultants</u> identifies another circumstance in which the contracting officer is afforded yet greater discretion. The court in <u>D & S Consultants</u> explained, procurements in which a best value determination is made afford the contracting officer broader decision making discretion than a negotiated procurement in which a best value determination is not at issue. <u>See</u> <u>id.</u>; <u>see</u> <u>also</u> <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d at 1330 (noting that contracting officers have great discretion in negotiated procurements but even greater discretion in best value determinations than in procurements based on cost alone); <u>PHT Supply Corp. v. United States</u>, 71 Fed. Cl. 1, 11 (2006) ("It is critical to

48

note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28; E.W. Bliss Co. v. United States, 77 F.3d at 449; and Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 707 (2011) ("[A] plaintiff's burden 'is elevated where the solicitation contemplates award on a "best value" basis.'" (citations omitted)); Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed. Cl. 106, 113 (2010); Serco v. United States, 81 Fed. Cl. 463, 496 (2008) ("To be sure, as noted at the outset, plaintiffs have a significant burden of showing error in that regard because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors.").

In addition, the court "assume[s] that the government acts in good faith while contracting." Galen Med. Assocs., Inc. v. United States, 56 Fed. Cl. 104, 108 (2003), aff'd, 369 F.3d 1324 (Fed. Cir. 2004). Thus, a protestor must show "'well-nigh irrefragable proof' that the government had an intent to injure it to overcome this presumption." Id. (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954)); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting. Torncello [v. United States], 681 F.2d [756,] 770 [(1982)]; Librach v. United States, 147 Ct.Cl. 605, 1959 WL 7633 (1959). A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it. Torncello, 681 F.2d at 770.").

In E.W. Bliss Co. v. United States, the United States Court of Appeals for the Federal Circuit offered guidance on the applicable standard of review in best value determinations:

> Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is "grounded in reason ... even if the Board itself might have chosen a different bidder"); In re General Offshore Corp., B-251969.5, B-251969.6, 94-1 Comptroller Gen.'s Procurement Decisions (Federal Publications Inc.) ¶ 248, at 3 (Apr. 8, 1994) ("In a negotiated procurement, any proposal that fails to conform to material terms and conditions of the solicitation should be considered unacceptable and may not form the basis for an award. Where an evaluation is challenged, we will examine

the agency's evaluation to ensure that it was reasonable and consistent with the evaluation criteria and applicable statutes and regulations, since the relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted).

\* \* \*

Bliss' [other challenges to the procurement] deal with the minutiae of the procurement process in such matters as technical ratings ... which involve discretionary determinations of procurement officials that a court will not second guess. See Lockheed Missiles & Space Co., 4 F.3d at 958; Grumman Data Systems Corp. v. Widnall, 15 F.3d 1044, 1048 (Fed. Cir. 1994) ("[S]mall errors made by the procuring agency are not sufficient grounds for rejecting an entire procurement.")....

E.W. Bliss Co. v. United States, 77 F.3d at 449; see also Vanguard Recovery Assistance v. United States, 101 Fed. Cl. at 780; Galen Med. Assocs., Inc. v. United States, 74 Fed. Cl. 377, 383-84 (2006); JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 388 (2001), aff'd, 279 F.3d 985 (Fed. Cir.), reh'g denied (Fed. Cir. 2002).

The FAR at 48 C.F.R. § 15.101-1 states the following with respect to the best value process:

(a) A tradeoff process is appropriate when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror.

(b) When using a tradeoff process, the following apply:

(1) All evaluation factors and significant subfactors that will affect contract award and their relative importance shall be clearly stated in the solicitation; and

(2) The solicitation shall state whether all evaluation factors other than cost or price, when combined, are significantly more important than, approximately equal to, or significantly less important than cost or price.

(c) This process permits tradeoffs among cost or price and non-cost factors and allows the Government to accept other than the lowest priced proposal. The perceived benefits of the higher priced proposal shall merit the additional cost, and the rationale for tradeoffs must be documented in the file in accordance with 15.406.

48 C.F.R. § 15.101-1 (current through Feb. 7, 2013).

Summarizing the challenge a protester faces in contesting a best value determination, a judge of the Court of the Federal Claims stated:

> The plaintiff in a bid protest thus "bears a heavy burden." Impresa, 238 F.3d at 1333. That burden lies heavier still when the plaintiff challenges a contract award made subsequent to negotiated procurement, where the procurement official is entrusted with "especially great discretion, extending even to his application of procurement regulations." Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002). Greater yet is the procurement official's discretion when selecting a contract-awardee on the basis of a best value determination rather than price alone. Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004).
>
> Of course, as courts have repeatedly observed, the greater the procurement official's vested discretion, the higher the threshold for finding the official's decision irrational or otherwise unlawful. See, e.g., id.; Burroughs Corp. v. United States, 617 F.2d 590, 597 (Ct. Cl. 1980); Cygnus Corp., Inc. v. United States, 72 Fed. Cl. 380, 384–85 (2006) [aff'd, 227 F. App'x 909 (Fed. Cir. 2007)]. An agency's contract award is thus least vulnerable to challenge when based upon a best value determination. See Galen Med. Assocs., 369 F.3d at 1330.

PlanetSpace Inc. v. United States, 96 Fed. Cl. 119, 125 (2010).

Generally speaking, the United States Court of Federal Claims "will not disturb an agency's best value decision merely because a disappointed bidder disagrees with the agency's analysis." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. at 515. But if "ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious." BayFirst Solutions, LLC v. United States, 102 Fed. Cl. 677, 695 (2012) (citing Huntsville Times Co. v. United States, 98 Fed. Cl. 100, 119 (2011)).

The FAR also describes the Source Selection Authority's responsibilities when performing a best value determination, and the documentation needed to support an agency's best value trade-off analysis. The relevant provision provides:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs. Although the rationale for the

51

selection decision must be documented, that documentation need not quantify the tradeoffs that led to the decision.

48 C.F.R. § 15.308 (current through Feb. 7, 2013).

The Court of Federal Claims has found that "[c]onclusory statements, devoid of any substantive content, have been held to fall short of" the FAR's documentation requirement, "threatening to turn the tradeoff process into an empty exercise." Serco Inc. v. United States, 81 Fed. Cl. at 497 (footnote omitted); see also FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 381 ("[W]hen selecting a low-price technically inferior proposal in a best-value procurement where non-price factors are more important than price, it is not sufficient for the government to simply state that a proposal's technical superiority is not worth the payment of a price premium. Instead, the government must explain specifically *why* it does not warrant a premium." (emphasis in original)). Thus, the FAR requires that the source selection authority document a rational basis for its best value determination.

The Code of Federal Regulations at 48 C.F.R. § 15.308, however, does not require the government to "quantify the tradeoffs that led to the decision." 48 C.F.R. §15.308. "In performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors." Serco Inc. v. United States, 81 Fed. Cl. at 497 (citing 48 C.F.R. § 15.308).

Plaintiff, One Largo, brings two claims before this court. In Count I, Plaintiff alleges that Defendant's evaluation of the Access to Metrorail[25] and Planning Efficiency and Flexibility technical sub-factors was arbitrary, capricious, and contrary to law because Defendant did not evaluate Plaintiff's proposal in accordance with the evaluation criteria set out in the Solicitation. Specifically, Plaintiff objects to Ms. Kronopolous', GSA's Regional Commissioner for the PBS, National Capital Region, alleged incorporation of a 2,500 feet standard under the Access to Metrorail sub-factor, and her alleged discounting of Plaintiff's technical advantages over Fishers Lane's

---

[25] At oral argument, Plaintiff's counsel stated that Defendant's evaluation of the Access to Metrorail sub-factor is the more significant of the two issues regarding Defendant's technical evaluation, because that sub-factor was "the most significant in the source selection plan, which the source selection official adopted," as it was rated at thirty-five percent of the technical factors. Plaintiff's counsel further indicated:

Counsel: If One Largo Metro's benefit is more than minor, One Largo Metro then has close to a two-step advantage in 35 percent of the non-price factors.

The Court: So, if I disagree on the significance of that, from your perspective, the house of cards topples?

Counsel: Yes.

proposal under the Planning Efficiency and Flexibility sub-factor. In Count II, Plaintiff alleges that Defendant, reasonably, could not have found that Fishers Lane's proposal represented the best overall value to the government because One Largo enjoyed significant technical advantages over Fishers Lane, and price was of "significantly less importance than the combined weight of the technical factors." Thus, according to Plaintiff, Defendant's decision that Fishers Lane's proposal was the most advantageous proposal to the government was arbitrary and capricious. As described above, One Largo seeks bid preparation and proposal costs in the amount of $4,038,739.00, to which, Plaintiff argues, it is entitled because Plaintiff has been directly harmed by Defendant's improper actions.

For the purposes of determining whether Defendant's award decision was arbitrary and capricious, the court primarily focuses on Ms. Kronopolous' second selection decision, issued on August 24, 2011. Because Ms. Kronopolous explicitly adopted the Source Selection Evaluation Board's January 12, 2011 Report and February 3, 2011 Addendum, and also relied on the reports issued by the Technical Evaluation Teams and Source Selection Authority, those documents, however, as well as Ms. Kronopolous' March 8, 2011 selection decision, also are discussed when relevant to the court's analysis.

### Access to Metrorail

The Solicitation required that all proposals be for facilities within three miles of a Metrorail station, "as measured from the main entrance of the building to the nearest entrance of the transit facility by the driving distance on existing roads," and that offerors located more than 2,500 walkable linear feet from a Metrorail station provide shuttle service at their own expense. The Source Selection Plan set forth the following adjectival ratings for the Access to Metrorail sub-factor:[26]

---

[26] As indicated above, the Solicitation provided that, for the purposes of the Access to Metrorail sub-factor "[d]istances will be measured from the main entrance of the building to the nearest entrance of the transit facility. . . ." The Source Selection Plan, however, stated that distances should be measured "from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance." In the first round of GAO protests in this case, the GAO rejected a challenge to Fishers Lane's "Highly Successful" rating on the Access to Metrorail factor, noting that, while there were inconsistencies in how distance from Metrorail was measured, Defendant's calculations were explained in the record and the protestors failed to show that Defendant's calculations were unreasonable. Whether the distance from Metrorail was measured from the main entrance of the building "to the nearest entrance of the Metrorail station," or "to the turnstile of the nearest Metro entrance," would not affect the outcome of this case, as neither One Largo's "Superior" rating, nor Fishers Lane's "Highly Successful" rating for the Access to Metrorail sub-factor would change. Moreover, Plaintiff has not raised this inconsistency in its Complaint.

| Rating | Distance to Metro |
|---|---|
| Superior | Within 1,500 wlf, as measured in walkable linear feet (wlf) from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Highly Successful | More than 1,500 wlf but up to 2,500 wlf, as measured in walkable linear feet from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Successful | More than 2,500 wlf but less than one mile, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Marginal | More than one mile but less than two miles, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |
| Poor | More than two miles but less than three miles, as measured by the driving distance of existing roads from the main entrance of the furthest building of the offered facility to the turnstile of the nearest Metro entrance |

Plaintiff argues that the offerors' proposals must be evaluated in accordance with the criteria laid out in the agency's Solicitation, but that Ms. Kronopolous deviated from the terms of Defendant's Solicitation in her analysis of the Access to Metrorail sub-factor. Specifically, Plaintiff alleges that Ms. Kronopolous determined that Plaintiff's and Fishers Lane's proposals "approached equality"[27] on the Access to Metrorail sub-factor, "on the basis that she believed that 2,500 feet was a reasonable walking distance, and thus, anyone proposing a building within 2,500 feet approached equality under Access to Metrorail with anyone else proposing a building within 2,500 feet." According to Plaintiff, the finding that the two proposals approached equality directly contradicted the Solicitation's requirement that "[b]uildings closer to an existing Metrorail station will be evaluated more highly."

Defendant responds that Ms. Kronopolous' evaluation of the Access to Metrorail sub-factor complied with the terms of the Solicitation. Defendant maintains that Plaintiff fundamentally misunderstands the terms of the Solicitation and the fact that it lays out two distinct analyses for evaluating each offer, and then for comparing them to one

---

[27] Plaintiff repeatedly argues in its briefs that Ms. Kronopolous concluded that One Largo and Fishers Lane "approached equality" on the Access to Metrorail sub-factor. When pressed at oral argument to point to where Ms. Kronopolous made such a statement, Plaintiff's counsel acknowledged that nowhere in her August 24, 2011 selection decision did Ms. Kronopolous state that One Largo and Fishers Lane "approached equality" on the Access to Metrorail sub-factor. Indeed, that phrase does not appear in Ms. Kronopolous' selection decision regarding the Access to Metrorail sub-factor. In fact, Ms. Kronopolous acknowledged the difference between Plaintiff and Fishers Lane on the Access to Metrorail sub-factor.

another: first a technical evaluation and, if appropriate, then a best value trade-off analysis. The first step, according to Defendant, was that "the TET [Technical Evaluation Teams] and SSEB [Source Selection Evaluation Board] rated each subfactor, providing weaknesses and strengths for each offeror." Ms. Kronopolous adopted the strengths, weaknesses, sub-factor ratings, and overall technical evaluations set forth in the Source Selection Evaluation Board's January 12, 2011 Report. Defendant points out that those ratings were unchanged in the February 3, 2011 Addendum and Plaintiff is not challenging those ratings. After the technical ratings were established, Defendant asserts that Ms. Kronopolous conducted a trade-off analysis, "to assess the *costs* of each technical offer, and determine which offeror provided the *best value* to the Government." (emphasis in original). In performing the trade-off analysis, Defendant argues, Ms. Kronopolous was required to "look[] beyond the adjectival rating scheme to determine the true value given the identified costs." Defendant emphasizes that Ms. Kronopolous must be afforded "significant deference" in making her best value determination.

Defendant contends that the requirement that "[b]uildings closer to an existing Metrorail station will be evaluated more highly," applied only to the technical evaluation of the Access to Metrorail sub-factor, and that this direction had no bearing on how Defendant should conduct its trade-off analysis. In describing the trade-off analysis, Defendant notes that the Solicitation explicitly stated: "Ultimately, if the highest technical offer is not the lowest priced offer, the Government will assess the value of the technical factors of an offer to reconcile the price and technical factors. The perceived benefits of the higher priced offer, if any, must merit the additional cost." Defendant asserts that the Source Selection Evaluation Board assigned Plaintiff a rating of "Superior" on the Access to Metrorail sub-factor in accordance with the Solicitation, a rating higher than the rating awarded to Fishers Lane of "Highly Successful," which ratings were adopted by Ms. Kronopolous in her August 24, 2011 selection decision. Only after she considered all of the ratings assigned by the Source Selection Evaluation Board for each of the sub-factors, did Ms. Kronopolous conduct a trade-off analysis, looking at the overall ratings of all of the offers. According to Defendant, Ms. Kronopolous determined, as part of her trade-off analysis, that Plaintiff's advantage on the Access to Metrorail sub-factor did not merit the more than $51 million cost difference between Plaintiff's and Fishers Lane's proposals and Plaintiff's proposal did not represent the best value to the government.

Plaintiff has repeatedly asserted that One Largo had a nearly "two-step" advantage over Fishers Lane on the Access to Metrorail sub-factor, as One Largo's proposed facility was safely in the "Superior" category at a distance of 525 walkable linear feet, while Fishers Lane's proposed facility was nearly five times more remote at 2,407 walkable linear feet, and only ninety-three feet short of falling from a "Highly Successful" to "Successful" rating. Plaintiff also emphasizes that, if Fishers Lane had been just another ninety-three feet farther away from the Metrorail, it would have been required to provide shuttle service to its building. Plaintiff alleges that, given this substantial difference, Ms. Kronopolous could not possibly have found, consistent with the Solicitation, that Plaintiff's and Fishers Lane's proposals approached equality on the

55

Access to Metrorail sub-factor. Plaintiff makes an additional argument, which is not dispositive, that the arbitrary nature of Ms. Kronopolous' evaluation of the Access to Metrorail sub-factor is demonstrated by the fact that, at the GAO hearing,[28] Ms. Kronopolous stated that proximity to Metrorail also has "cost implications associated with" it, and the inconvenience to employees of having to walk to a more distant location "was not a cost to the government." Plaintiff argues that Ms. Kronopolous' statement at the GAO is in direct conflict with the importance the Solicitation assigned to buildings located closer to Metrorail, and the requirement that these buildings be more highly rated because: "[i]n addition to providing a convenient means of commuting to and from work for HHS employees, access to Existing Metrorail is also important as it provides a useful method for employees to travel back and forth to other HHS facilities, during normal business hours."

Plaintiff also argues that Ms. Kronopolous' incorporation of a 2,500 feet standard into her analysis of the Access to Metrorail sub-factor was arbitrary and capricious. Plaintiff asserts that the Solicitation made no reference to 2,500 feet being a reasonable walking distance. Again, plaintiff cites to Ms. Kronopolous' testimony at the GAO hearing when she was asked about, but could not cite to, any such reasonable walking distance standard in the Solicitation, Source Selection Plan, or any specific GSA policy establishing that 2,500 feet constitutes the agency's standard for a reasonable walking distance. Defendant, on the other hand, maintains that the Solicitation establishes 2,500 feet as a dividing line by requiring any proposal beyond that distance to provide shuttle service at the offeror's own expense, as well as by calculating any distance beyond that in driving distance, rather than walkable linear feet. Defendant also argues that it is irrelevant that Ms. Kronopolous could not identify a specific policy document referencing a 2,500 feet standard at the GAO hearing because, ultimately, Ms. Kronopolous conducted a thorough, independent analysis of the practical consequences of the difference in distance between Plaintiff's and Fishers Lane's proposals. Finally, Defendant points out that the Source Selection Authority's trade-off analysis is highly discretionary, and relies on PlanetSpace Inc. v. United States, 96 Fed. Cl. at 125 (award is "least vulnerable to challenge when based upon a best value determination" (citing Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330)), in support of this contention.

Plaintiff is correct that an agency must interpret offerors' proposals in accordance with the terms of the solicitation as issued. As discussed in Red River Holdings, LLC v. United States:

---

[28] Both parties stated at oral argument that Ms. Kronopolous' GAO testimony can be considered by this court. Plaintiff's counsel stated that the court can use Ms. Kronopolous' GAO testimony because it was "part of her decision." Defendant's counsel stated that Defendant is "not arguing against the consideration of the transcript in this case." "[B]y rule, previous GAO testimony is properly part of the administrative record in a bid protest." See PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 548 (citing RCFC, App. C, ¶ 22(u) (2012)).

"It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation. FAR § 15.305(a) provides that, '[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.' See also Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004) ('The agency's failure to follow its own selection process embodied in the Solicitation is ... a prejudicial violation of a procurement procedure established for the benefit of offerors.')[, modified on unrelated grounds, 63 Fed. Cl. 141 (2004)]; Banknote [Corp. v. United States], 56 Fed. Cl. [377,] 386 [(2003)] ('It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation.')[, aff'd, 365 F.3d 1345 (Fed. Cir. 2004)]; ITT Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 194 (1999) (citations omitted) ('[A] contract award may not be upheld when the [source selection authority] improperly departs from [the] stated evaluation criteria in a solicitation.')."

Red River Holdings, LLC v. United States, 87 Fed. Cl. 768, 786 (2009) (quoting Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 374 (2009)); see also Glenn Defense Marine (Asia) PTE, Ltd. v. United States, 97 Fed. Cl. 311, 318 (2011), dismissed, 469 F. App'x 865 (Fed. Cir. 2012). Failure to adhere to the evaluation scheme laid out in a solicitation may constitute evidence of an arbitrary and capricious decision. See id. at 786 ("When the evaluation of proposals materially deviates from the evaluation scheme described in the solicitation, the agency's failure to follow the described plan may constitute evidence of arbitrary and capricious decision-making." (quoting L–3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 653 (2008))); 360Training.com, Inc. v. United States, 106 Fed. Cl. 177, 184 (2012) (quoting Ala. Aircraft Indus., Inc. v. United States, 586 F.3d 1372, 1375–76 (Fed. Cir. 2009) ("[A] court's role is to "determine whether the agency's ... analysis was consistent with the evaluation criteria set forth in the [solicitation]....") (bracket in original, omissions in original)).

Defendant correctly points out that the Solicitation in this case sets forth a two-step analysis for evaluating offers. First, Defendant was to evaluate each offer for its technical merit on each of the factors and sub-factors, as ranked in importance in the Solicitation. In the second stage, if appropriate, Defendant could use the trade-off process to evaluate technical merit together with price. The Solicitation describes these two steps in reverse order. First, under the heading, "Award Factors and Price Evaluation," the Solicitation describes the best value trade-off analysis. The Solicitation explains that the award would be made to the offer that was "most advantageous to the Government and provide[d] the best value to the Government," based on both price and non-price factors. The Solicitation then details the trade-off process and the relationship between price and technical ratings to be used for the procurement, stating:

For this procurement, price is of significantly less importance than the combined weight of the technical factors; however, the degree of importance of price as a factor becomes greater as technical offers approach equality. Ultimately, if the highest technical offer is not the lowest priced offer, the Government will assess the value of the technical factors of an offer to reconcile the price and technical factors. The perceived benefits of the higher priced offer, if any, must merit the additional cost.

The Solicitation also lays out the technical evaluation criteria. The Solicitation recites the technical factors to be used to evaluate each offer, identifies the sub-factors under each factor, and ranks the relative importance of the factors and sub-factors. The plain language and organization of the Solicitation indicates that the Solicitation's requirement that the buildings closer to Metrorail be evaluated more highly applies to Defendant's technical evaluation of the Access to Metrorail sub-factor for each offer. Other sections of the Solicitation describing additional technical sub-factors to be evaluated contain similar language. For example, under the Access to Amenities sub-factor, the Solicitation states: "The best rating will be given to offers that provide the greatest variety and quantity of amenities." Under the Planning Efficiency and Flexibility sub-factor, the Solicitation reads: "Buildings which provide for more efficiency and flexibility will be more highly evaluated," further suggesting that, in indicating that offers should be more highly evaluated for certain features, the Solicitation was referring to the technical evaluation stage of the evaluation process, and not to the best value trade-off analysis. Moreover, the Source Selection Plan clarifies that the Technical Evaluation Teams and Source Selection Evaluation Board were tasked with performing the technical evaluation for each offer, while the Source Selection Authority, in this case Ms. Kronopolous, was responsible for making a best value determination, based on the information supplied by the Technical Evaluation Teams and Source Selection Evaluation Board. The initial assignment of responsibilities to those conducting the technical evaluation and technical recommendation, as opposed to a trade-off analysis, supports Defendant's argument that the evaluation of offers was divided into two distinct stages, one following the other: first a technical evaluation and, if appropriate, then a best value trade-off analysis.

Defendant asserts that there was no requirement for the government to find that a proposal that offered property closer to Metrorail represented the best value to the government. The Agency was only required to give that proposal a higher rating on the Access to Metrorail sub-factor, which the parties agree was value weighted at thirty-five percent of the technical factors. Defendant argues that the Solicitation's requirement to give a higher technical rating for proximity to Metrorail was met in Ms. Kronopolous' August 24, 2011 selection decision.

Defendant is correct that One Largo's offer was rated more highly than Fishers Lane's offer on the Access to Metrorail sub-factor at every stage during the Defendant's technical evaluation process. The Technical Evaluation Team assigned to evaluate the Location factor assigned One Largo a rating of "Superior" on the Access to Metrorail

58

sub-factor, while Fishers Lane received a rating of "Highly Successful." The Source Selection Evaluation Board determined that Plaintiff's proposed building was located 525 walkable linear feet from the entrance of the nearest Metrorail station, while Fishers Lane's building was 2,407 walkable linear feet away. Based on those distances, and according to the adjectival ratings set forth in the Source Selection Plan, the Source Selection Evaluation Board assigned Plaintiff a rating of "Superior," while Fishers Lane received a lower rating of "Highly Successful," on Access to Metrorail in the Source Selection Evaluation Board's January 12, 2011 Report. The Source Selection Evaluation Board did not change its evaluation of the Access to Metrorail sub-factor in the February 3, 2011 Addendum to its original report. The Source Selection Authority adopted the Source Selection Evaluation Board's technical ratings of each offeror on each technical sub-factor. Finally, in both her March 8, 2011 decision and in her August 24, 2011 decision, Ms. Kronopolous explicitly adopted the adjectival ratings contained in the Source Selection Evaluation Board's January 12, 2011 Report, which were unchanged in the February 3, 2011 Addendum, for the Access to Metrorail technical sub-factor, and for all of the technical sub-factors for each offeror. Thus, at each step of the technical evaluation process, One Largo's offer was rated more highly than Fishers Lane's offer with regard to the Access to Metrorail sub-factor, and received a "Superior" rating from the Technical Evaluation Team, Source Selection Evaluation Board, Source Selection Authority, and twice from Ms. Kronopolous, while Fishers Lane received a "Highly Successful" rating at each stage of the procurement proceedings.

In her August 24, 2011 decision, Ms. Kronopolous adopted the Source Selection Evaluation Board's technical ratings on all sub-factors, except Access to Amenities, which she re-evaluated in light of the GAO's first protest decision. She then "reviewed the technical merits of the offers as a whole." She determined that the re-evaluation of the Access to Amenities sub-factor did not affect the overall technical ratings of the five offers. Ms. Kronopolous, therefore, again adopted the overall technical scores stated in the Source Selection Evaluation Board's January 12, 2011 Report. Those ratings placed King Farm's offer, the lowest priced offer, below all four of the other offers in terms of technical merit. King Farm received an overall rating of "Highly Successful," while each of the other four offerors received an overall rating of "Superior." By adopting the Source Selection Evaluation Board's overall technical ratings, Ms. Kronopolous indicated her agreement that the lowest priced offer was not the highest technical offer. Thus, in accordance with the Solicitation, a best value trade-off analysis was warranted.

Ms. Kronopolous turned to conducting a best value trade-off analysis before making a second selection decision. She indicated that her trade-off analysis in her August 24, 2011 decision "look[ed] beyond the SSEB's adjectival ratings to identify, review and examine the strengths and weaknesses of each technical offer, and given those strengths and weaknesses, to determine the relative technical merits of the offers." Ms. Kronopolous' trade-off analysis began with a discussion of each of the technical factors and sub-factors. Regarding Access to Metrorail, Ms. Kronopolous unequivocally stated: "By virtue of its small distance to Metro (525 wlf), One Largo is the strongest offer in this important sub-factor." Thus, Ms. Kronopolous acknowledged

Plaintiff's advantage over Fishers Lane on the Access to Metrorail sub-factor even in the trade-off process. In her August 24, 2011 selection decision, Ms. Kronopolous indicated that three other offers, including Fishers Lane's offer, were all "within what GSA considers to be reasonable walkable distance to Metro." She elaborated on what she considered a "reasonable walking distance" in her discussion of King Farm's offer, which she concluded was not within a reasonable walking distance. She stated: "GSA considers 2,500 wlf to be a reasonable walking distance from a Metro station to a federally occupied office building. If a location is further than this, it merits a lower technical rating." In addition, directly comparing Plaintiff's and Fishers Lane's proposals, Ms. Kronopolous reasoned that, although Plaintiff's building provided "very easy access to Metro," Fishers Lane was within the "standard walking distance to public transportation as established in other GSA procurements." Ms. Kronopolous further noted that she had conducted research into the average walking speed for adults, and used this to determine that it would take under ten minutes to walk 2,500 feet. As noted above, she stated in footnote 6 of her August 24, 2011 selection decision:

> In assessing the real world impact of this discrepancy in distance, I came to understand, from various internet websites, that the walking speed of the average adult is between 3 and 3.5 miles per hour. Using the lower number, it would take about 9.45 to 9.5 minutes to walk 2,500 walkable linear feet. Therefore, most employees will be able to walk the distance from Metro to the Parklawn [Fishers Lane] Building in less than 10 minutes. In my judgment a 10 minute walk will not be a major barrier preventing employees from commuting by Metro.

Plaintiff argues that Ms. Kronopolous' incorporation of a 2,500 feet "reasonable walking distance" standard in her August 24, 2011 decision contradicts the plain language of the Solicitation. Although the Solicitation did not state that GSA had established a policy that 2,500 feet constitutes a reasonable walking distance, nor was Ms. Kronopolous able to point to such a written policy,[29] the Solicitation did differentiate between proposals that were within 2,500 feet of an existing Metrorail station and those

---

[29] As an attachment to its Cross-Motion for Judgment Upon the Administrative Record, Defendant submitted a 2007 GSA Memorandum entitled "Green Lease Policies and Procedures for Lease Acquisition." This memorandum applied to "any new leasing activity" and, under the heading "Public Transportation," stated: "The building shall be located within ____ [2640 walkable feet (1/2 mile)] of a commuter rail, light rail, or subway station or ____ [1,320 walkable feet (1/4 mile)] of two or more public or campus bus lines usable by tenant occupants." (brackets and omissions in original). Although this Memorandum may provide an argument for Defendant's assertion that GSA had developed an internal policy on reasonable distances from public transportation, it does not establish that GSA used 2,500 feet as the standard for a reasonable walking distance, nor was the document made part of the Administrative Record in the case before this court. Whether or not GSA had such a set policy, however, is not at issue in this case. The question is whether Ms. Kronopolous' analysis of the Access to Metrorail sub-factor was in accordance with the Solicitation, and, therefore, not arbitrary and capricious.

that were farther away.  The Solicitation required that all buildings be within three miles of a Metrorail station, but required for any building more than 2,500 walkable linear feet from a Metrorail station that an offeror provide shuttle service at its own expense.  In addition, the Solicitation indicated that, for the purposes of evaluating this sub-factor, "[d]istances will be measured from the main entrance of the building to the nearest entrance of the transit facility, in walkable linear feet (wlf) or, if it is more than 2,500 wlf, by the driving distance of existing roads."  Thus, the Solicitation explicitly differentiated between buildings that were within 2,500 feet, and those that were not.  Likewise, the Source Selection Plan used 2,500 feet as the dividing line between "Highly Successful" and "Successful" ratings on the Access to Metrorail sub-factor, indicating that offers within 1,500 walkable linear feet should be rated as "Superior," those more than 1,500 walkable linear feet, but less than 2,500 as "Highly Successful," and those more than 2,500 walkable linear feet, but less than one mile as "Successful."  This reference to 2,500 feet in the Source Selection Plan also indicates that the Agency had announced to offerors, prior to submission of proposals, that there was a meaningful difference between offers within 2,500 feet and those that were farther away, and that offers would be evaluated accordingly.  Therefore, Ms. Kronopolous' reference to a 2,500 feet reasonable walking distance in her trade-off analysis did not contradict the terms of the Solicitation, with regard to how Defendant would evaluate each offer under the Access to Metrorail sub-factor.

As Plaintiff conceded at oral argument, Ms. Kronopolous did not say in her August 24, 2011 written decision that Plaintiff and Fishers Lane approached equality on the Access to Metrorail sub-factor.  Rather, after discussing the technical evaluations of all of the offers regarding all of the technical factors, Ms. Kronopolous stated:

> Based upon all of the above, and considering further the relative importance assigned by the SFO [Solicitation] to the technical factors (and in particular, the SFO's statement that ". . . Access to Metrorail is more important than any other sub-factor. . ."), I have determined that notwithstanding variations in the adjectival ratings assigned by the SSEB, the technical offers of New Carrollton, Park Lawn [Fishers Lane], UTC [University] and One Largo are all of very high quality, and as a whole, approach equality.

(omissions in original).  Consistent with the Solicitation, Ms. Kronopolous did rate Plaintiff more highly than Fishers Lane on the Access to Metrorail sub-factor because Plaintiff's building was closer to an existing Metrorail station than Fishers Lane's building.  She determined in her best value trade-off analysis, however, that Plaintiff's advantage on that sub-factor did not merit a higher overall technical rating, as compared to three other high quality offers, including the Fishers Lane offer, and that the proposals approached technical equality.

Significantly, the GAO never faulted Ms. Kronopolous' evaluation of the Access to Metrorail sub-factor, even though Plaintiff and other protestors raised this issue with the GAO.  Ms. Kronopolous' first selection decision, issued on March 8, 2011, also

adopted the technical ratings from the Source Selection Evaluation Board's January 12, 2011 Report, which were unchanged in the February 3, 2011 Addendum, for each sub-factor. The GAO rejected arguments made by King Farm and Metroview that Fishers Lane's offer was incorrectly rated as "Highly Successful" on the Access to Metrorail sub-factor in Ms. Kronopolous' first selection decision, dated March 8, 2011. The GAO found that Fishers Lane's "Highly Successful" rating was documented in the contemporaneous record. Rather, the GAO faulted Ms. Kronopolous' first selection decision for its evaluation of the Access to Amenities sub-factor and its trade-off analysis, and granted the protestors relief on those two grounds.

In the second set of protests before the GAO, challenging Ms. Kronopolous' August 24, 2011 selection decision, One Largo and Metroview both argued that Ms. Kronopolous failed to recognize their superiority over Fishers Lane on the Access to Metrorail sub-factor, instead finding that their offers approached technical equality with Fishers Lane on the Access to Metrorail sub-factor. The GAO rejected this argument, finding that Ms. Kronopolous had "looked beyond the adjectival ratings to determine the practical aspects of the distances from a Metrorail station. The HCA was not unreasonable in concluding, consistent with the SFO [Solicitation], that any distance shorter than 2,500 wlf was a reasonable walking distance." The GAO added that Ms. Kronopolous "recognized in her written decision and in her testimony before us that One Largo's and Metroview's proposals merited the superior ratings they received under this sub-factor because of their greater proximity to Metro. The HCA nonetheless concluded that this superiority did not merit the additional cost to the government."

Although this court is not bound by the GAO, it does typically show respect to GAO decisions. See Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. 35, 39 (2007) ("Decisions by the GAO are traditionally treated with a high degree of deference, especially in bid protest actions." (citing E.W. Bliss Co. v. United States, 33 Fed. Cl. 123, 135 (1995))); see also Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. 226, 230 n.2 (2012) (quoting Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are not binding authority, but may be "instructive in the area of bid protests.")). Decisions of the GAO are treated as expert opinions, which the court should "prudently consider." Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003), aff'd in part, rev'd in part sub nom. Cherokee Nation of Okla. v. Leavitt, 543 U.S. 631 (2005); see also Glenn Def. Marine (Asia) PTE Ltd. v. United States, 97 Fed. Cl. 568, 577 (2011), dismissed, 459 F. App'x 906 (Fed. Cir. 2011); Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 623 (2005). A judge of the United States Court of Federal Claims has stated that the court should be "especially reluctant to interfere with the procurement process when, as here, the GAO has upheld the contracting officer's decision. Thus, to the extent that we find such decisions 'reasonable and persuasive in light of the administrative record,' we shall accord such decisions deference." Consol. Eng'g Services, Inc. v. United States, 64 Fed. Cl. at 623 (quoting Howell Constr. Inc. v. United States, 12 Cl. Ct. 450, 452 (1987)).

As determined above, in her August 24, 2011 selection decision, Ms. Kronopolous acknowledged Plaintiff's advantage over Fishers Lane on the Access to Metrorail sub-factor. By adopting the Source Selection Evaluation Board's technical ratings of "Superior" for One Largo, and "Highly Successful" for Fishers Lane on the Access to Metrorail sub-factor, Ms. Kronopolous complied with the Solicitation's requirement that buildings closer to Metrorail be evaluated more highly. She also adopted the Source Selection Evaluation Board's overall technical ratings from its January 12, 2011 Report, putting the lowest priced offer, King Farm, at a technical disadvantage, and, thus, engaged in a best value trade-off analysis. As part of her trade-off analysis, Ms. Kronopolous once again acknowledged Plaintiff's advantage over Fishers Lane on the Access to Metrorail sub-factor. She determined, however, looking beyond the adjectival ratings, that Plaintiff's advantage on the Access to Metrorail sub-factor did not merit a higher overall technical rating, and did not justify the substantial price difference between One Largo's offer and Fishers Lane's offer. Ms. Kronopolous' reference to a 2,500 feet "reasonable walking distance" was not contrary to the terms of the Solicitation. The Solicitation articulated distinctions based on distance between buildings, including a distinction based on buildings within 2,500 walkable linear feet of a Metrorail station and those that were farther away. Although the reasonableness of Ms. Kronopolous' trade-off analysis is addressed below, Plaintiff has failed to show that Ms. Kronopolous' technical evaluation of One Largo's and Fishers Lane's offers under the Access to Metrorail sub-factor was contrary to the terms of the Solicitation, or that it was unreasonable. See 5 U.S.C. § 706; see also Bannum, Inc. v. United States, 404 F.3d at 1351.

### Planning Efficiency and Flexibility

Plaintiff also argues that Ms. Kronopolous' technical evaluation of the Planning Efficiency and Flexibility sub-factor in her August 24, 2011 decision was arbitrary and capricious because she discounted Plaintiff's technical advantage over Fishers Lane on this sub-factor. Plaintiff alleges that Ms. Kronopolous found that the difference between the offers submitted by One Largo and Fishers Lane on this sub-factor was "slight," based on the fact that Plaintiff's offer had several minor weaknesses. Plaintiff argues that Ms. Kronopolous did not acknowledge in her decision that Fishers Lane shared those same minor weaknesses, and argues that if those minor weaknesses detracted from Plaintiff's proposal, they also should have detracted from Fishers Lane's proposal. Plaintiff cites FirstLine Transportation Security, Inc., v. United States, 100 Fed. Cl. 359, 382 (2011), for the proposition that source selection officials can reject the technical evaluations of the Source Selection Evaluation Board, but they must set forth a rational basis for doing so. In addition, Plaintiff, citing to Standard Communications, Inc. v. United States, 101 Fed. Cl. 723, 735 (2011), notes that the source selection official's decision must be well-documented, and, to be well-documented, it must possess more than mere generalizations. Plaintiff argues that Ms. Kronopolous' decision failed to set forth a rational basis for concluding that Plaintiff's advantage over Fishers Lane on this sub-factor was "slight," and that Ms. Kronopolous' decision was not well-documented. Moreover, Plaintiff notes that, during her testimony at the GAO hearing, Ms. Kronopolous undermined her own rationale for her assessment of the Planning

Efficiency and Flexibility sub-factor, without providing a satisfactory explanation for her analysis. Even if she had provided a reasonable rationale in her testimony before the GAO, Plaintiff asserts that the court should not consider it because any reason Ms. Kronopolous put forth after her written decision would be a post hoc rationalization and, therefore, deserves no credibility.[30]

Defendant argues that Plaintiff conflates the two-step analysis in which Defendant engaged when evaluating the offerors' final proposals. Defendant asserts that Ms. Kronopolous expressly adopted the Source Selection Evaluation Board's higher rating of One Largo on the Planning Efficiency and Flexibility sub-factor, as compared to the rating assigned to Fishers Lane. Defendant claims that Ms. Kronopolous determined that Plaintiff's proposal offered only slightly more planning efficiency and flexibility than Fishers Lane's proposal. According to Defendant, Ms. Kronopolous, after examining each of the technical sub-factors, then engaged in a trade-off analysis, as a result of which she decided that Plaintiff's "slight" technical advantage did not warrant the significant price difference between the two proposals. Defendant responds that Ms. Kronopolous' analysis was not arbitrary and capricious, and that she adequately documented her decision and her rationale. Moreover, Defendant contends, nothing Ms. Kronopolous said at the GAO hearing undermined her rationale for concluding that Plaintiff's technical advantage was "slight." According to defendant, her GAO testimony was an explanation of her written decision. Defendant asserts that Plaintiff disagrees with Ms. Kronopolous' business judgment, but that disagreement is insufficient to support a finding that she acted arbitrarily, citing Banknote Corp. of Am., Inc v. United States, 56 Fed. Cl. at 384 ("[A]n offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably." (citations omitted)).

As with the Access to Metrorail sub-factor, the court must determine with respect to the Planning Efficiency and Flexibility sub-factor whether Defendant's evaluation of One Largo's and Fishers Lane's proposals was consistent with the terms of the Solicitation. With regard to the Planning Efficiency and Flexibility sub-factor, the Solicitation stated:

> Each building will be evaluated for overall planning efficiency. This evaluation will include blocking and stacking plans, floor plate sizes, circulation factors, common area factors, rentable to usable square foot ("r/u") ratios, column spacing, column bay sizing, core configuration and placement, window mullion spacing, and other indicia of planning efficiency and flexibility. . . . The Government prefers solutions that offer integrated performance effectiveness with more efficiency and more flexibility for layout and more flexibility for future reconfigurations. Proximity and accessibility of the loading dock to the freight elevator and ability of the lobby design to accommodate integration of Government

---

[30] As noted above, Plaintiff conceded at oral argument, however, that Ms. Kronopolous' GAO testimony could be considered by the court because it was "part of her decision."

security requirements will also be considered.  Buildings which provide for more efficiency and flexibility will be more highly evaluated.

The Source Selection Plan further indicated:

The Government prefers a building that contains the following features:

- floor plate sizes,
  - Efficient floor plate approximately 36,000 USF
  - Rectangular in shape
- common area factors,
  - Useable to gross 75%
- column spacing,
  - Even, regular column spacing no less than 25'
  - Optimum 30' X 45'
- core configuration and placement
  - Interior, rectangular core containing standard building support elements, i.e., egress stairs, electrical and telephone closets, toilet rooms, janitor closet
  - 45' from core to window wall.
  - Z-type corridor at core
- window mullion spacing
  - 5' on center and each mullion wide enough to receive a 4" gypsum board partition.
- and other relevant indicia of planning efficiency and flexibility.
  - Column grid, window grid and ceiling grid all modular and related to one another on a 5' module.
  - 100 PSI live load throughout
  - Mix of ambient and direct lighting
  - Consistent 9' ceiling height; 10' for training and conference rooms.
  - Flexible infrastructure.
  - Generally, a rectangular floor plan.

And the Source Selection Plan's general formula for assigning adjectival ratings applied to the Planning Efficiency and Flexibility sub-factor, as follows:

- Superior: Many significant strengths; no significant weaknesses; some minor weaknesses.
- Highly Successful: Many significant strengths; few significant weaknesses; some minor weaknesses.
- Successful: Some significant and minor strengths and weaknesses, but meets the minimum requirements defined in the SFO [Solicitation].
- Marginal: Some strengths; many weaknesses. A marginally acceptable offer.
- Poor: Some or no strengths; many significant weaknesses. An offer that fails to meet the minimum requirements defined in the SFO

[Solicitation] and is unacceptable. Offerors receiving a "Poor" rating will be given the opportunity to meet the minimum requirements.

The Source Selection Evaluation Board Report indicated that:

For those Offers included in the competitive range, the final evaluation will also consider the test fits prepared by the Offeror's architect for a typical floor as certified by the Offeror. The Government prefers solutions that offer integrated performance effectiveness with more efficiency and more flexibility for layout and with flexibility for future reconfiguration. The Government also prefers to minimize the travel distance between employees within the facility(ies). The Government will also coordinate the percentage of usable office space that can be located within 45' of a windowed perimeter. Ratings will be based on strengths and weaknesses of offer.

With respect to the Planning Efficiency and Flexibility sub-factor, the Source Selection Evaluation Board rated One Largo as "Superior," and found that it had four significant strengths, six minor strengths, no significant weaknesses, and four minor weaknesses. The Source Selection Evaluation Board indicated that One Largo's significant strengths were:

- 87% Common Area Factor exceeds the Source Selection Plan preference of 75%, resulting in a more efficient floor plate.
- 5' on center mullion spacing meets Source Selection Plan preference increasing daylight penetration and improving office views.
- 65,440 SF floor plate greatly exceeds the Source Selection Plan preference of 36,000 SF, limiting the amount of employee dispersion and increasing overall efficiency.
- In accordance with the SSEB rating table, a 1.117 Rentable to Usable Square Foot Ratio ("r/u") translates to a more efficient floor plate.

The Source Selection Evaluation Board indicated that One Largo's minor strengths were:

- Z-type corridor meets the Source Selection Plan preference.
- 8' 6" typical ceiling height exceeds the Solicitation standard, promoting a greater sense of openness.
- Interior core meets the Source Selection Plan preference, which translates to a more efficient floor plate.
- Column free areas increase ease of space planning.
- 80 pounds per square foot live load exceeds the Solicitation standard and allows for greater storage and workstation flexibility.

66

- The majority of the space consists of 30' x 45' column spacing which meets the Source Selection Plan's "optimum" spacing preference.

The Source Selection Evaluation Board noted that there were no significant weaknesses and identified the minor weaknesses in One Largo's proposal as:

- non-uniform column spacing, which negatively affects space planning and decreases the Government's flexibility in arranging systems furniture;
- non-rectangular floor plate, which does not meet the Source Selection Plan preference and decreases the overall efficiency as well as efficiency of space planning;
- non-rectangular core does not meet Source Selection Plan preference; and
- the distance from the core to the window wall exceeds the 45' Source Selection Plan preference in certain areas.

Fishers Lane was rated as "Highly Successful" on the Planning Efficiency and Flexibility sub-factor, and the Source Selection Evaluation Board found that its proposal had five significant strengths, three minor strengths, one significant weakness, and four minor weaknesses. The Source Selection Evaluation Board indicated that the significant strengths in Fishers Lane's proposal were:

- 54,970 SF floor plate exceeds the Source Selection Plan preference of 36,000 SF, limiting the amount of employee dispersion and increasing overall efficiency
- 88% Common Area Factor exceeds the Source Selection Plan preference of 75%, resulting in a more efficient floor plate.
- 5' on center mullion spacing meets Source Selection Plan preference, increasing daylight penetration and improving office views.
- The interior core is less than 45' from the window wall, significantly increasing the natural light penetration within the building.
- 100 pounds per square foot live load meets the Source Selection Plan preference and exceeds the Solicitation standard, which allows for greater storage and workstation flexibility

The Source Selection Evaluation Board indicated that the minor strengths in Fishers Lane's proposal were:

- 8' 2" – 8' 10' typical ceiling height exceeds the Solicitation standard, promoting a greater sense of openness.
- In accordance with the SSEB rating table, a 1.13 Rentable to Usable Square Foot Ratio ("r/u") translates to a more efficient floor plate.

- Interior core meets Source Selection Plan preference, which translates to a more efficient floor plate.

The Source Selection Evaluation Board noted that the significant weakness in Fishers Lane's proposal was that the "20' X 24' and 19' X 20' column spacing is less than the SSP [Source Selection Plan] preference of 25', which negatively affects space planning," and identified the minor weaknesses as:

- non-rectangular floor plate does not meet the Source Selection Plan preference and decreases the overall efficiency as well as efficiency of space planning;
- non-uniform column spacing, which negatively affects space planning and decreases the Government's flexibility in arranging systems furniture;
- non-rectangular core does not meet Source Selection Plan preference; and
- U-shape corridor increases the travel time between offices, and negatively affects the overall efficiency of the building.

In its "Consensus Grade," the Source Selection Evaluation Board stated: "[t]he SSEB members concurred that while the offered site [by Fishers Lane] meets many of the SSP preferences, the offer had at least one (1) significant weakness, which did not change as a result of the Offeror's December 17, 2010 Final Proposal Revision, and as a result assigned a **HIGHLY SUCCESSFUL** rating." (emphasis in original)

In sum, as with the Access to Metrorail sub-factor, Plaintiff's offer was more highly rated than Fishers Lane's offer on the Planning Efficiency and Flexibility sub-factor at every step of the technical evaluation process. The Technical Evaluation Team assigned to assess the Building Characteristics factor assigned One Largo's offer a "Superior" rating on the Planning Efficiency and Flexibility sub-factor, finding that it had nine significant strengths, one minor strength, no significant weaknesses, and one minor weakness. The Technical Evaluation Team assigned Fishers Lane a "Highly Successful" rating, based on seven significant strengths, one minor strength, one significant weakness, and two minor weaknesses. In its January 12, 2011 Report, the Source Selection Evaluation Board assigned One Largo's offer a "Superior" rating on the Planning Efficiency and Flexibility sub-factor, finding that it had four significant strengths, six minor strengths, no significant weaknesses, and four minor weaknesses. Fishers Lane was rated "Highly Successful" by the Source Selection Evaluation Board because it enjoyed five significant strengths, three minor strengths, one significant weakness, and four minor weaknesses. Both Plaintiff's and Fishers Lane's proposals were found to have two of the same minor weaknesses: 1) "[n]on-uniform column spacing negatively affects space planning and decreases the Government's flexibility in arranging systems furniture;" and 2) "[n]on-rectangular floor plate does not meet the SSP preference and decreases the overall efficiency, as well as efficiency of space planning." The Source Selection Evaluation Board did not change its technical ratings of the Planning Efficiency and Flexibility sub-factor in its February 3, 2011 Addendum to

68

its original January 12, 2011 Report. The Source Selection Authority adopted the Source Selection Evaluation Board's ratings of all the offers on all technical sub-factors, as did Ms. Kronopolous in both her first and second selection decisions. Thus, as with the Access to Metrorail sub-factor, One Largo was rated more highly than Fishers Lane on the Planning Efficiency and Flexibility sub-factor by each of Defendant's source selection entities and officials.

As stated above, Ms. Kronopolous' August 24, 2011 decision adopted the strengths and weaknesses assigned to each offer and the sub-factor ratings for each, as well as the overall technical ratings assigned by the Source Selection Evaluation Board in its January 12, 2011 Report. After adopting the Source Selection Evaluation Board's findings, including the finding that the lowest priced offer from King Farm was not the highest rated technical offer, Ms. Kronopolous decided to engage in a trade-off analysis, as permitted by the Solicitation. In her trade-off analysis, regarding the Planning Efficiency and Flexibility sub-factor she stated: "Looking beyond the adjectival ratings, I find that the lower rating of Parklawn [Fishers Lane] for Planning Efficiency and Flexibility is justified by the building's tight column spacing that will affect future space planning and flexibility." Ms. Kronopolous, therefore, acknowledged that Fishers Lane had a significant weakness that warranted its "Highly Successful" rating on the Planning Efficiency and Flexibility sub-factor, as opposed to the other four offerors, each of which was rated "Superior" on the Planning Efficiency and Flexibility sub-factor. Ms. Kronopolous continued, however, "I also note that notwithstanding its adjectival rating, the layout of One Largo's building has non-uniform column spacing and a non-rectangular floor plate." She further noted that King Farm's offer, which also was rated "Superior" on the Planning Efficiency and Flexibility sub-factor, had non-uniform column spacing, as did One Largo's offer. Ms. Kronopolous stated: "I also find that these weaknesses are not of such severity as to detract from the overall quality of the offers, which were all technically very strong in the Building Characteristics category." As part of her trade-off analysis, Ms. Kronopolous determined that, although some offers had weaknesses on the Planning Efficiency and Flexibility sub-factor, all five offers were of high technical quality on the three sub-factors comprising the Building Characteristics factor.

Comparing Plaintiff's and Fishers Lane's offers, Ms. Kronopolous stated:

With respect to the building's planning efficiency and flexibility, Parklawn [Fishers Lane] has a significant weakness with respect to its tight column spacing. This will negatively affect space planning and flexibility in future lease years. One Largo Metro has larger column spacing; however, there are other aspects of the space planning at One Largo Metro that will have a negative effect on space planning and flexibility such as the non-uniform column spacing and the non-rectangular floor plate.

Thus, Ms. Kronopolous again acknowledged Fishers Lane's significant weakness, although she did not specifically mention that Fishers Lane also shared both of the minor weaknesses, which she had characterized as "limitations" of One Largo's offer.

69

Discussing the overall trade-off between cost and technical merit for One Largo's and Fishers Lane's offers, Ms. Kronopolous concluded that "One Largo Metro also has Planning Efficiency and Flexibility limitations such that the difference between the two offers in the sub-factor is slight." She concluded, however, even in this regard, that Plaintiff's "small technical advantage" over Fishers Lane did not merit the significant price difference between the two offers.

Ms. Kronopolous' determination that the difference between One Largo's and Fishers Lane's proposals on the Planning Efficiency and Flexibility sub-factor was "slight" was made as part of her trade-off analysis and did not contradict the terms of the Solicitation, nor was it unreasonable. The Solicitation provided that "[b]uildings which provide for more efficiency and flexibility will be more highly evaluated." One Largo's offer was more highly evaluated than Fishers Lane's offer on the Planning Efficiency and Flexibility sub-factor in Ms. Kronopolous' August 24, 2011 decision, earning a "Superior" rating, while Fishers Lane's offer was assigned a rating of "Highly Successful." According to the Solicitation, the Planning Efficiency and Flexibility sub-factor looked at a wide array of characteristics for each proposal, including "blocking and stacking plans, floor plate sizes, circulation factors, common area factors, rentable to usable square foot ('r/u') ratios, column spacing, column bay sizing, core configuration and placement, window mullion spacing, and other indicia of planning efficiency and flexibility." After evaluating a large number of features for each proposal, the Source Selection Evaluation Board found that One Largo's proposal had four significant strengths, six minor strengths, no significant weaknesses, and four minor weaknesses. The Source Selection Evaluation Board found that Fishers Lane's offer had five significant strengths, three minor strengths, one significant weakness, and four minor weaknesses. Therefore, the Source Selection Evaluation Board determined that Fishers Lane's offer had one more significant strength, but also one more significant weakness than One Largo's offer, while One Largo's offer had three more minor strengths than Fishers Lane's offer, and the two offers had the same number of minor weaknesses.

The Source Selection Evaluation Board, although awarding One Largo a higher grade than Fishers Lane on the Planning Efficiency and Flexibility sub-factor, "Superior," as compared to "Highly Superior," did not do so unanimously given the various technical ratings awarded to Plaintiff and Fishers Lane. As indicated in the Source Selection Evaluation Board's Report "Consensus Grade" for One Largo on the Planning Efficiency and Flexibility sub-factor:

> The SSEB was split 4-1, however the majority concluded that the Offeror [One Largo] made significant design modifications that directly addressed technical deficiencies including column spacing, which was eliminated as a significant weakness, and a decrease in the R/U ratio which resulted in an improved rating. The SSEB members concurred that the offered site met and in many cases exceeded the SSP preference, and as a result assigned a **SUPERIOR** rating based on the abundance of significant strengths, and the elimination of their one (1) significant weakness. The

70

dissenting opinion was that the final grade be Highly Successful due to the numerous minor weaknesses. However, per the SSP, agreement was reached because there was no significant difference in the evaluator's grades by more than a single adjective.

(emphasis in original). The Source Selection Plan's formula for assigning a "Superior" rating instead of "Highly Successful" rating, was: "Superior: Many significant strengths; no significant weaknesses; some minor weaknesses," and "Highly Successful: Many significant strengths; few significant weaknesses; some minor weaknesses." One Largo did not have any significant weaknesses, a requirement for a Superior rating, but like Fishers Lane, which was rated "Highly Successful," did have four minor weaknesses. Fishers Lane had one significant weakness, which likely would have precluded a rating of "Superior" under the Source Selection Plan, which Ms. Kronopolous recognized. But Fishers Lane did have many significant strengths, including one more than One Largo, and only some minor weaknesses. After review, Ms. Kronopolous adopted the Source Selection Evaluation Board's January 12, 2011 Report and February 3, 2011 Addendum. She agreed with their evaluations of the Planning Efficiency and Flexibility sub-factor, and was not arbitrary or capricious in concluding that the difference between One Largo's and Fishers Lane's proposals on the Planning Efficiency and Flexibility sub-factor was "slight."

Ms. Kronopolous' August 24, 2011 decision may not have been as precise as it could have been in terms of explaining how she evaluated the two minor weaknesses that One Largo's and Fishers Lane's offers shared, when concluding that the differences between the two proposals was only "slight." When asked about her assessment of the Planning Efficiency and Flexibility sub-factor at the GAO hearing, Ms. Kronopolous said that she tried to look beyond the adjectival ratings when she conducted her trade-off analysis and found that "on the whole ... the differential from the adjectival rating did not necessarily help understand -- help present the true distinction. And I thought that the true distinction was not as significant." Asked specifically, however, why the two minor weaknesses she referenced with regard to Plaintiff's proposal made the difference between Plaintiff's "Superior" rating and Fishers Lane's "Highly Successful" rating only "slight," Ms. Kronopolous stated:

> I actually didn't approach it that way. I didn't look at it that way. So what I looked at was there were some minor weaknesses in One Largo's as well, and those were two examples. So it was not to say that it negates every -- it kind of counterweights and gives more advantage to Fishers Lane. So my slight advantage was much more about, even though I just acknowledged that there were some minor weaknesses there, it was much more about the factor, if you look at the SFO [Solicitation] and all the criteria that you look at in the planning efficiency and flexibility subfactor, that -- its -- the column spacing is still just one of a number of criteria that they were looking for, that we were looking for.

71

In its second decision, the GAO faulted Ms. Kronopolous' August 24, 2011 decision for not mentioning that Fishers Lane had the same two minor weaknesses as Plaintiff in the Planning Efficiency and Flexibility category, stating:

> Despite the HCA's [Ms. Kronopolous'] testimony that she was aware at the time of her selection decision of these weaknesses in Fishers Lane's proposal, the HCA's written selection decision does not acknowledge that Fishers Lane's proposal had these same weaknesses. Moreover, the HCA was unable to articulate at our hearing an explanation for this omission from her decision.

The GAO concluded, however, that Plaintiff failed to demonstrate that it was competitively prejudiced by Ms. Kronopolous' decision. The court agrees that Ms. Kronopolous' written decision should have accounted for the fact that Fishers Lane shared the same two minor weaknesses in the Planning Efficiency and Flexibility sub-factor that she characterized as "limitations" of Plaintiff's offer. Ms. Kronopolous, however, after her overall review of Plaintiff's offer and Fishers Lane's offer, found the difference between the two offers on the Planning Efficiency and Flexibility sub-factor only "slight." Her failure to specifically acknowledge the Fishers Lane weaknesses does not make her conclusion that the difference between One Largo's offer and Fishers Lane's offer on the Planning Efficiency and Flexibility sub-factor was "slight" an unreasonable one, and the contemporaneous record supports Ms. Kronopolous' conclusions.

Plaintiff points out that the GAO's first decision also found fault with Ms. Kronopolous' evaluation of the Access to Amenities sub-factor in her March 8, 2011 selection decision, and found that her error in evaluating the Access to Amenities sub-factor prejudiced King Farm. Plaintiff argues that Ms. Kronopolous' evaluation of the Access to Amenities sub-factor in her first selection decision is similar to her final evaluation of the Planning Efficiency and Flexibility sub-factor in her second selection decision. Plaintiff asserts that the Access to Amenities sub-factor was only assigned a weight of ten percent in the Source Selection Plan, as compared to a weight of fifteen percent for the Planning Efficiency and Flexibility sub-factor, and that there was only a one-step difference between King Farm's and Fishers Lane's technical evaluations on that sub-factor, which were "Superior" and "Highly Successful," respectively. There were noticeable differences, however, between the two evaluations. King Farm was the lowest-priced bidder and the Source Selection Evaluation Board originally found that King Farm represented the best overall value to the government. Plaintiff's offer was significantly higher-priced than the chosen offeror, Fishers Lane, and was never chosen by any selection official to represent the best value to the government, although Plaintiff enjoyed a one-step advantage over Fishers Lane on the Planning Efficiency and Flexibility sub-factor, "Superior" as compared to "Highly Successful." Moreover, in the first round of protests, the GAO found that Defendant's evaluation of all of the offers under the Access to Amenities factor was inconsistent with the terms of the Solicitation.

Ms. Kronopolous could reasonably have determined that the difference between Plaintiff's and Fishers Lane's offers was only "slight" on the Planning Efficiency and Flexibility sub-factor because both proposals enjoyed a similar number of strengths and weaknesses. The GAO also stated: "[t]he weaknesses in dispute were only two among many criteria the [Source Selection Evaluation Board] considered. . . ." Ms. Kronopolous failed to document the fact that Fishers Lane shared the two minor weaknesses, which she considered "limitations" under the terms of the Solicitation. She did, however, look beyond the adjectival ratings assigned to each proposal and weighed what she considered the actual differences in the proposals' technical quality. The scope of the analytical error in Ms. Kronopolous' analysis of the Planning Efficiency and Flexibility sub-factor in her final decision is not the same as Defendant's error in evaluating the Access to Amenities sub-factor in the first round of evaluations.

Moreover, the Planning Efficiency and Flexibility sub-factor was a small part of the overall technical evaluation because it was assigned a weight of fifteen percent in the Source Selection Plan. That Plaintiff enjoyed a one-step advantage on a sub-factor that was only weighted at fifteen percent of the non-price factors does not demonstrate that Ms. Kronopolous' assessment of Plaintiff's and Fishers Lane's offers as having approached equality overall was arbitrary or capricious, or that Ms. Kronopolous would have changed her conclusion that none of the four proposals with higher technical ratings offered the lowest price, and, therefore, that a trade-off analysis was appropriate.

Plaintiff cites to two United States Court of Federal Claims cases for support that Ms. Kronopolous' evaluations of the sub-factors was arbitrary and capricious: FirstLine Transportation Security, Inc., v. United States, 100 Fed. Cl. at 359, and Standard Communications, Inc. v. United States, 101 Fed. Cl. at 723. Plaintiff's citations, however, are inapt. Plaintiff argues that FirstLine Transportation Security, Inc., v. United States establishes that the source selection official can reject the technical evaluations of the Source Selection Evaluation Board, but must set forth a rational basis for doing so. Here, Ms. Kronopolous did not reject the technical evaluations of the Source Selection Evaluation Board, rather, she explicitly adopted the Source Selection Evaluation Board's January 12, 2011 Report. Likewise, Plaintiff cites to Standard Communications, Inc. v. United States, for the proposition that the source selection official's decision must be well-documented, meaning it must contain more than mere generalizations. The portion of Standard Communications, Inc. v. United States to which Plaintiff refers discusses a Source Selection Authority's trade-off analysis, not the technical evaluations of offers and whether or not the technical evaluations were made in accordance with the Solicitation. Thus, Plaintiff's reliance on Standard Communications, Inc. v. United States for the argument that Ms. Kronopolous' evaluation of the Planning Efficiency and Flexibility sub-factor was arbitrary and capricious is misplaced.

The court concludes that Ms. Kronopolous' evaluation of One Largo's and Fishers Lane's offers under the Planning Efficiency and Flexibility sub-factor in her August 24, 2011 decision was not inconsistent with the terms of the Solicitation.

73

Rather, Ms. Kronopolous adopted the Source Selection Evaluation Board's "Superior" rating for One Largo on the Planning Efficiency and Flexibility sub-factor, as well as the Board's "Highly Successful" rating for Fishers Lane. This was in accordance with the Solicitation's requirement that "[b]uildings which provide more efficiency and flexibility will be rated more highly." Therefore, Ms. Kronopolous' August 24, 2011 decision was not arbitrary and capricious based on the technical evaluation of the Planning Efficiency and Flexibility sub-factor.

Plaintiff states that, but for Ms. Kronopolous' actions, it would have had a substantial chance at being awarded the contract. Plaintiff also alleges that because the GAO sustained the first round of protests and concluded that Ms. Kronopolous' analysis of the Access to Amenities sub-factor was in error, and her error prejudiced protestor King Farm, Plaintiff was prejudiced by Ms. Kronopolous' arbitrary and capricious analysis of the Access to Metrorail sub-factor and the Planning Efficiency and Flexibility sub-factor. Plaintiff's reliance on the previous protest at the GAO, or a procurement process that was subsequently revised, is not dispositive.

This court is not bound by GAO decisions, although they are of interest and persuasive to the court. See Grunley Walsh Int'l, LLC v. United States, 78 Fed. Cl. at 39 (citing E.W. Bliss Co. v. United States, 33 Fed. Cl. at 135); see also Elec. On-Pump, Inc. v. United States, 104 Fed. Cl. 151, 167 n.12 (2012); Precision Images, LLC v. United States, 79 Fed. Cl. 598, 619 n.40 (2007), aff'd, 283 F. App'x 813 (Fed. Cir. 2008); Tel–Instrument Elec. Corp. v. United States, 56 Fed. Cl. 174, 177 n.2 (2003), aff'd, 87 F. App'x 752 (Fed. Cir. 2004); North Carolina Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 166 n. 13 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003). In addition, the United States Court of Appeals for the Federal Circuit has stated:

> A bid protest proceeds in two steps. First... the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second... if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351. As determined above, this court has determined that Ms. Kronopolous' analysis regarding the Access to Metrorail sub-factor and the Planning Efficiency and Flexibility sub-factor was not arbitrary and capricious, notwithstanding Ms. Kronopolous having committed a minor error on the Planning Efficiency and Flexibility sub-factor, as pointed out by the GAO. In the first round of protests, the GAO found that Ms. Kronopolous had erred with regard to the full analysis of the Access to Amenities sub-factor, and suggested that a re-evaluation of the entire sub-factor was required, but in the second round of protests the GAO did not conclude that a full re-evaluation was required for either the Access to Metrorail sub-factor or the Planning Efficiency and Flexibility sub-factor, which are challenged in the current protest.

Moreover, unlike King Farm, which was the lowest priced bidder and which the Source Selection Evaluation Board originally found represented the best overall value to the government, One Largo's offer was approximately $51 million more than Fishers Lane's offer, the offeror who received the contract award. For One Largo to prevail, Ms. Kronopolous would have had to conclude, in a trade-off analysis, that One Largo represented the best value to the government, because, under the terms of the Solicitation, "if the highest technical offer is not the lowest priced offer, the Government will assess the value of the technical factors of an offer to reconcile the price and technical factors."

### Trade-off Analysis

Plaintiff also alleges that, because Ms. Kronopolous' evaluations of the Access to Metrorail and Planning Efficiency and Flexibility sub-factors were arbitrary and capricious, therefore, her trade-off analysis was necessarily arbitrary and capricious as well. Plaintiff also argues that Ms. Kronopolous gave undue weight to price in her trade-off analysis. According to Plaintiff, based on Ms. Kronopolous' erroneous conclusion that Plaintiff's and Fishers Lane's proposals approached equality on the Access to Metrorail sub-factor, and her conclusion that the difference between the two offers on the Planning Efficiency and Flexibility sub-factor was only "slight," she concluded that the two offers approached equality overall, and treated price as though it was more important than the combined weight of the non-price factors. Plaintiff contends that Ms. Kronopolous' treatment of price as more important than non-price factors contradicted the Solicitation's instruction that price be given "significantly less importance than the combined weight of the technical factors" unless the offers approached technical equality. According to Plaintiff, One Largo enjoyed close to a "two-step advantage" over Fishers Lane on the Access to Metrorail sub-factor, which was weighted at thirty-five percent of the technical evaluation factors, and a one-step advantage on the Planning Efficiency and Flexibility sub-factor, which was weighted at fifteen percent of the technical evaluation factors, while Fishers Lane only had only a one-step advantage over Plaintiff on the Access to Amenities sub-factor, which was weighted at ten percent of the technical evaluation factors. Thus, according to Plaintiff, Fishers Lane's proposal did not approach equality with Plaintiff's proposal, and Ms. Kronopolous should not have conducted her trade-off analysis on the basis that price was an important consideration.

Defendant responds that the Source Selection Evaluation Board determined in its January 12, 2011 Report that both Plaintiff's and Fishers Lane's offers deserved "Superior" ratings overall, a determination which Ms. Kronopolous adopted, and which Plaintiff has never challenged. Based on the Source Selection Evaluation Board's conclusion, Ms. Kronopolous decided that Plaintiff's and Fishers Lane's offers approached overall equality. Defendant argues that Ms. Kronopolous' second selection decision, dated August 24, 2011, then took "each of the four offerors that she determined to 'approach equality' and discusse[d] and focuse[d] upon the real areas of technical distinction and the cost implications of those distinctions." Defendant maintains that Ms. Kronopolous properly treated price as an important consideration and focused her trade-off analysis on the question of whether the benefits of Plaintiff's

offer merited its additional cost, as required by the Solicitation. Defendant emphasizes that there was a significant price difference between the two offers, $51 million over the life of the lease. According to Defendant, after review of the evaluations of each proposal, Ms. Kronopolous determined that the technical advantage of Plaintiff's offer over the offer submitted by Fishers Lane did not merit the additional cost. Defendant insists that Ms. Kronopolous' decision was both consistent with the terms of the Solicitation and supported by the Administrative Record.

FAR 15.308 governs the Source Selection Authority's best value determination in government procurement decisions, and states:

> The source selection authority's (SSA) decision shall be based on a comparative assessment of proposals against all source selection criteria in the solicitation. While the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment. The source selection decision shall be documented, and the documentation shall include the rationale for any business judgments and tradeoffs made or relied on by the SSA, including benefits associated with additional costs.

48 C.F.R. § 15.308 (current through Feb. 7, 2013). This court has interpreted FAR 15.308 to encompass two requirements: 1) the source selection authority "must reach an independent award decision based on a comparative assessment of the proposals against all of the criteria set forth in the solicitation;" and 2) the source selection authority "must document its independent award decision." FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 382; see also Akal Sec., Inc. v. United States, 103 Fed. Cl. at 335 ("FAR 15.308 has two relevant requirements: 1) the SSA must use his or her independent judgment in making a source selection and 2) the source selection decision must be documented, including the rationale for any business judgments and tradeoffs made or relied on by the SSA."); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 120 (2006) ("'Although source selection officials may reasonably disagree with the ratings and recommendations of evaluators, they are nonetheless bound by the fundamental requirement that their independent judgments be reasonable, consistent with the stated evaluation scheme and adequately documented.'" (quoting Matter of Dyncorp Int'l LLC, No. B–289863, 2002 CPD ¶ 83, 2002 WL 1003564 (Comp. Gen. May 13, 2002))), recons. in unrelated part, 75 Fed. Cl. 406 (2007). To be well-documented, the source selection decision "must contain more than conclusory and generalized statements." Standard Commc'ns, Inc. v. United States, 101 Fed. Cl. at 735 (citing Serco Inc. v. United States, 81 Fed. Cl. at 497 ("Conclusory statements, devoid of any substantive content, have been held to fall short of" the documentation requirement in FAR 15.308.)).

A judge of the United States Court of Federal Claims summarized the requirements of FAR 15.308 as follows:

First, the regulation requires the agency to make a business judgment as to whether the higher price of an offer is worth the technical benefits its acceptance will afford. See, e.g., TRW, Inc. [v. Unisys Corp.], 98 F.3d [1325, 1327 (Fed. Cir. 1996)]; Dismas Charities, Inc., 61 Fed. Cl. [191, 203 (2004)]. Doing this, the decisional law demonstrates, obliges the agency to do more than simply parrot back the strengths and weaknesses of the competing proposals—rather, the agency must dig deeper and determine whether the relative strengths and weaknesses of the competing proposals are such that it is worth paying a higher price. Second, in performing the tradeoff analysis, the agency need neither assign an exact dollar value to the worth associated with the technical benefits of a contract nor otherwise quantify the non-cost factors. FAR § 15.308 ("the documentation need not quantify the tradeoffs that led to the decision"); Widnall v. B3H Corp., 75 F.3d 1577, 1580 (Fed. Cir. 1996). But, this is not to say that the magnitude of the price differential between the two offers is irrelevant—logic suggests that as that magnitude increases, the relative benefits yielded by the higher-priced offer must also increase. See Beneco Enters., Inc., 2000 C.P.D. ¶ 69, 1999 WL 1713451, at *5 (1999). To conclude otherwise, threatens to "minimize[ ] the potential impact of price" and, in particular, to make "a nominal technical advantage essentially determinative, irrespective of an overwhelming price premium." Coastal Sci. and Eng'g, Inc., 89–2 C.P.D. ¶ 436, 1989 WL 237564, at *2 (1989); see also Lockheed Missiles & Space Co., 4 F.3d at 959–60. Finally—and many cases turn on this point—the agency is compelled by the FAR to document its reasons for choosing the higher-priced offer. Conclusory statements, devoid of any substantive content, have been held to fall short of this requirement, threatening to turn the tradeoff process into an empty exercise. Indeed, apart from the regulations, generalized statements that fail to reveal the agency's tradeoff calculus deprive this court of any basis upon which to review the award decisions. See Johnson Controls World Servs., 2002 WL 1162912, at *6; Satellite Servs., Inc., 2001 C.P.D. ¶ 30, at *9–11; Si–Nor, Inc., 2000 C.P.D. ¶ 159, 1999 WL 33210196, at *3 (1999).

Serco Inc. v. United States, 81 Fed. Cl. at 496-97.

Although the Source Selection Authority's decision must comply with FAR 15.308, a plaintiff bears a significant burden to demonstrate error in the Source Selection Authority's trade-off analysis, because procurement officials have a very high degree of discretion when it comes to best value determinations. See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 (because "the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone"); see also Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 ("It is well-established

77

that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." (citing TRW, Inc. v. Unisys Corp., 98 F.3d at 1327-28)); Am. Tel. & Tel. Co. v. United States, 307 F.3d at 1379; E.W. Bliss Co. v. United States, 77 F.3d at 449 ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government. See Lockheed Missiles & Space Co., Inc. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993); cf. Widnall v. B3H, 75 F.3d 1577 (Fed. Cir. 1996) (holding that Board of Contract Appeals should defer to agency's best value decision as long as it is 'grounded in reason... even if the Board itself might have chosen a different bidder')...."); Lockheed Missiles & Space Co. v. United States, 4 F.3d at 958; Burney v. United States, 2012 WL 1632353, at *6 ("We give a high level of deference to an agency's evaluation of proposals and best value determinations, recognizing the agency's expertise in procurement matters and application of regulations. See CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (citing E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996)). An agency's action will be upheld unless the protestor can show that the agency's action was without a rational basis. Impresa Construzioni Gemo. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001)."); Akal Sec., Inc. v. United States, 103 Fed. Cl. at 329 ("The United States Court of Appeals for the Federal Circuit has recognized that '[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government.'" (quoting E.W. Bliss Co. v. United States, 77 F.3d at 449)); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. at 514. The Federal Circuit has held that an agency's procurement decision will be upheld so long as it "evince[s] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 (citing Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. at 285); Honeywell, Inc. v. United States, 870 F.2d at 648 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." (quoting M. Steinthal & Co. v. Seamans, 455 F.2d at 1301)).

Courts give agencies such a high degree of discretion in best value determinations because it is necessarily a subjective process. Any decision to contract is "inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for." Sperry Flight Sys. v. United States, 212 Ct. Cl. at 339, 548 F.2d at 921; see also Omega World Travel v. United States, 54 Fed. Cl. 570, 578 (2002) ("The higher burden" for plaintiffs in negotiated procurements "exists because the contracting officer engages in what is an 'inherently a judgmental process.'" (quoting Burroughs Corp. v. United States, 617 F.2d at 598)). The determination of which offer represents the "overall best value to the government" involves layers of decision-making and judgment calls regarding which proposals offer the overall highest technical merit, and what technical advantages are worth a higher price. The court is reluctant to second guess contracting officials in such a process.

Plaintiff's claim that Ms. Kronopolous' trade-off decision was arbitrary and capricious focuses heavily on the proposition that Ms. Kronopolous' evaluation of Plaintiff's and Fishers Lane's offers under the Access to Metrorail and Planning Efficiency and Flexibility sub-factors was arbitrary and capricious, and therefore, her trade-off analysis was necessarily arbitrary and capricious, as well. The court has found, however, that Ms. Kronopolous' evaluation of the Access to Metrorail and Planning Efficiency and Flexibility sub-factors was reasonable, and not arbitrary and capricious. As discussed above, the court agrees with Defendant that Ms. Kronopolous did not find that Plaintiff's and Fishers Lane's proposals approached equality on the Access to Metrorail and Planning Efficiency and Flexibility sub-factors individually, but, instead, that the proposals submitted by One Largo and Fishers Lane, along with Metroview's and University's offers, approached equality overall. Ms. Kronopolous also concluded that King Farm's offer, the lowest priced offer, was not as highly rated as the other four offers, and did not approach equality. Plaintiff cannot prevail on the argument that Ms. Kronopolous' trade-off analysis was necessarily arbitrary and capricious based on her evaluation of two technical sub-factors, which the court has found were reasonable and not arbitrary or capricious.

In her August 24, 2011 selection decision, Ms. Kronopolous set out to address the two problems identified by the GAO in the first round of protests in this case in her first selection decision: 1) the flawed evaluation of the Access to Amenities sub-factor, and 2) the lack of meaningful consideration of the technical differences between the offerors in making her original trade-off decision. Therefore, her first step in the subsequent August 24, 2011 selection decision was to re-evaluate every offer under the Access to Amenities sub-factor. Plaintiff does not specifically challenge Ms. Kronopolous' re-evaluation of the Access to Amenities sub-factor in her August 24, 2011 selection decision before this court. Nevertheless, the court notes that Ms. Kronopolous' evaluation of the Access to Amenities sub-factor in her second, August 24, 2011 selection decision was consistent with the terms of the Solicitation and relevant in her trade-off analysis. Ms. Kronopolous indicated that she began her analysis of the Access to Amenities sub-factor by adopting the strengths and weaknesses of each offer as set out in the Source Selection Evaluation Board's January 12, 2011 Report, but then adjusted the Source Selection Evaluation Board's technical ratings for the Access to Amenities sub-factor based on additional research performed by the Agency's broker. Ms. Kronopolous' evaluation of the Access to Amenities sub-factor in her second, August 24, 2011 selection decision focused on accounting for the total number of amenities offered, instead of just the amenity categories offered, as her original decision had done, as well as the hours of operation for all amenities. Based on her revisions, she created a new chart to assess each offeror's Access to Amenities. One Largo's results were as follows:

79

| Category | Within 1,500 WLF | Within 2,500 WLF |
|---|---|---|
| Restaurants | | |
| Fast Food | 3 | 3 |
| Day Care | | |
| Fitness Facility | | |
| Dry Cleaners | | |
| Bank/ATM | | 1 |
| Postal Facility | | |
| Convenience Shop | 1 | 1 |
| Cards/Gift Shop | | 3 |
| Hair Salons | | 1 |
| Automotive Service Stations | | |
| Drug Stores | | |
| | | |
| Total Amenities | 4 | 9 |
| Total Categories | 2 | 5 |

Ms. Kronopolous found:

> While there are a good number of amenities and a few food options within close proximity of the site, the site lacks a variety of additional amenities. This lack of variety limits the errands and personal tasks that employees can accomplish before and after work or during their lunch break. Compounding this is the fact that 3 of the total amenities are card/gift shops. Because of the lack of variety of amenities, taking the variety, quantity, hours and proximity of amenities into consideration, I find that One Largo Metro merits a rating of Successful for this subfactor.

Ms. Kronopolous included the following chart of Fishers Lane's offered amenities:

| Category | Within 1,500 WLF | Within 2,500 WLF |
|---|---|---|
| Restaurants | | |
| Fast Food | 4 | 5 |
| Day Care | | |
| Fitness Facility | | |
| Dry Cleaners | 1 | 2 |
| Bank/ATM | 2 | 2 |
| Postal Facility | 1 | 1 |
| Convenience Shop | 1 | 1 |
| Cards/Gift Shop | 1 | 1 |
| Hair Salons | 1 | 2 |
| Automotive Service Stations | 7 | 9 |
| Drug Stores | | |
| | | |
| Total Amenities | 18 | 23 |
| Total Categories | 8 | 8 |

Ms. Kronopolous stated that Fishers Lane should receive a "Highly Successful" rating, according to the Source Selection Plan, because it had at least eight amenities within 2,500 walkable linear feet. She added: "In fact, these same amenity categories are found within 1,500 wlf, offering even better access for employees." Ms. Kronopolous emphasized the number of eating establishments within 2,500 walkable linear feet of Fishers Lane's building, but only gave Fishers Lane credit for a few of the automotive service stations offered, concluding: "Because of the variety, quantity, hours and proximity of amenities, I find that Parklawn [Fishers Lane] merits a rating of Highly Successful approaching Superior for this subfactor."

Ms. Kronopolous included charts for each of the other three offerors' amenities proposals, and rated King Farm "Highly Successful approaching Superior" on the Access to Amenities sub-factor, based on her finding that it offered twelve total amenities in eight amenity categories within 1,500 walkable linear feet, and sixteen total amenities in ten amenity categories within 1,500 walkable linear feet. Metroview received a "Marginal" rating, as Ms. Kronopolous found it had only four total amenities in three amenity categories within 1,500 walkable linear feet, and no additional amenities within 2,500 walkable linear feet. Finally, Ms. Kronopolous rated University as "Superior" on this sub-factor, finding that University offered thirteen total amenities in eight amenity categories within 1,500 walkable linear feet, and twenty-nine total amenities in eleven amenity categories within 2,500 walkable linear feet. Although offering less than nine amenity categories within 1,500 walkable linear feet placed University in the "Highly Successful" category under the Source Selection Plan, Ms. Kronopolous raised the rating to "Superior," based on the "significant variety" of amenities offered, and the large number of eating facilities within close proximity of University's proposed building.

The Solicitation provided that offers would be evaluated based on the "quantity, variety, hours and proximity" of available amenities, giving the best rating to the offers "that provide the greatest variety and quantity of amenities with good hours of operation existing at the time of occupancy within the building or with 1,500 walkable linear feet of the building." By looking at the total number of amenities, as well as amenity categories represented, and the hours of operation for each amenity, and by distinguishing between amenities that were within 1,500 versus 2,500 walkable linear feet, Ms. Kronopolous complied with the requirement of the Solicitation in her evaluation of the Access to Amenities sub-factor in her August 24, 2011 selection decision, and the GAO did not criticize the revised Access to Amenities evaluation in the second round of protests.

After re-evaluating the Access to Amenities sub-factor, Ms. Kronopolous' August 24, 2011 selection decision turned to an assessment of the five offerors' overall technical merit. She adopted the strengths and weaknesses set out in the Source Selection Evaluation Board's January 12, 2011 Report for each offeror, as well as the sub-factor ratings assigned to each offeror for every sub-factor except Access to Amenities. She considered the following sub-factor ratings in her final analysis:

| | Location | | Building Characteristics | | | Past Performance/Key Personnel | |
|---|---|---|---|---|---|---|---|
| | Access to Metrorail (35%) | Access to Amenities (10%) | Number of Buildings (20%) | Planning Efficiency and Flexibility (15%) | Quality of Building Architecture, Building Systems, and Construction (10%) | Past Performance (5%) | Key Personnel (5%) |
| King Farm | Marginal | Highly Successful approaching Superior | Superior | Superior | Superior | Superior | Superior |
| New Carrollton | Superior | Marginal | Superior | Superior | Superior | Neutral | Highly Successful |
| One Largo Metro | Superior | Successful | Superior | Superior | Superior | Neutral | Superior |
| Parklawn | Highly Successful | Highly Successful approaching Superior | Superior | Highly Successful | Superior | Superior | Superior |
| University Town Center | Highly Successful | Superior | Superior | Superior | Highly Successful | Superior | Highly Successful |

Factoring in her new ratings for the Access to Amenities sub-factor, Ms. Kronopolous concluded that "the overall technical merits and ratings of the offerors" had not changed from her first decision. Thus, she again adopted the overall technical ratings stated in the Source Selection Evaluation Board's January 12, 2011 Report, which rated all of the

offerors as "Superior" overall, except King Farm, which was rated "Highly Successful." With those overall ratings in place, Ms. Kronopolous again concluded that King Farm was the lowest priced offeror, but not the highest technical offeror, thus, directing her to conduct another trade-off analysis.

Ms. Kronopolous' trade-off analysis began by stating her conclusion that Fishers Lane represented the best overall value to the government. She then stated the terms of the Solicitation pertaining to the best value trade-off analysis, emphasizing that the Solicitation called for a trade-off analysis in which price was "significantly less important than the combined weight of the technical factors," but that "the degree of importance of price as a factor increase[d] as technical offers approach[ed] equality." Ms. Kronopolous explained the GAO's objections to her first trade-off decision, and stated that, in response, in her new trade-off analysis, she "look[ed] beyond the SSEB's adjectival ratings to identify, review and examine the strengths and weaknesses of each technical offer, and given those strengths and weaknesses, to determine the relative technical merits of the offers."

Ms. Kronopolous' August 24, 2011 selection decision discussed each of the three technical factors and the respective sub-factors, as set forth in the Solicitation, and compared all five offerors' ratings on each. Under the Location factor, Ms. Kronopolous stated, regarding the Access to Metrorail sub-factor, "One Largo is the strongest offer in this important sub-factor, [sic] I also find that New Carrollton [Metroview] (1,280 wlf), Parklawn [Fishers Lane] (2,407 wlf) and UTC [University] (2,350 wlf) are all within what GSA considers to be reasonable walkable distance to Metro." Ms. Kronopolous found, however, that King Farm's proposed building, which was located approximately 1.3 miles from the nearest Metrorail station, was at a "substantially greater distance" from the Metrorail, a weakness which was not overcome by King Farm's provision of shuttle bus service, which was a requirement in the Solicitation for any proposed building that was more than 2,500 walkable linear feet away from a Metrorail station. Regarding Access to Amenities, Ms. Kronopolous stated that, while University stood out in terms of quantity, the offers of University, Fishers Lane, and King Farm "are the strongest while One Largo Metro and New Carrollton [Metroview] are weaker due to the fewer amenity categories offered."

Ms. Kronopolous considered the three sub-factors under the Building Characteristics factor together, stating: "The SSEB rated all offerors Superior in all three categories, with the exception of Highly Successful ratings of Parklawn [Fishers Lane] for Planning Efficiency and Flexibility, and of UTC [University] for Quality of Building Architecture, Systems and Construction." Ms. Kronopolous found that "the lower rating of Parklawn for Planning Efficiency and Flexibility is justified by the building's tight column spacing that will affect future space planning and flexibility." Ms. Kronopolous also noted that, "notwithstanding its adjectival rating, the layout of One Largo's building has non-uniform column spacing and a non-rectangular floor plate and that the layout of King Farm's building also has non-uniform column spacing." She concluded that "these weaknesses are not of such severity as to detract from the overall quality of the offers, which were all technically very strong in the Building Characteristics category."

Finally, Ms. Kronopolous reiterated that the Source Selection Evaluation Board had rated all offerors as either "Superior," which included King Farm, Fishers Lane, and University, or "Neutral," which included Metroview and One Largo, on the Past Performance sub-factor, and as either "Superior," which included One Largo, Fishers Lane, and King Farm, or "Highly Successful," which included Metroview and University, on the Key Personnel sub-factor. Ms. Kronopolous found, "[t]he high ratings for this category reflect the strength of the proposed development teams of all of these offerors, and the relatively minor differences which separate one offer from another." Based on all of the technical sub-factors, "and considering further the relative importance assigned by the SFO [Solicitation] to the technical factors," Ms. Kronopolous determined: "notwithstanding variations in the adjectival ratings assigned by the SSEB, the technical offers of New Carrollton [Metroview], Parklawn [Fishers Lane], UTC [University] and One Largo are all of very high quality, and as a whole, approach equality."

Ms. Kronopolous found, however, that King Farm, the lowest priced offer, was "of a lower technical quality due to the significant weakness of its offer in the sub-factor that, individually, the Government deemed most important: Access to Metro." Ms. Kronopolous explained why King Farm did not approach technical equality with the other four offerors. She noted the importance of being within walking distance of a Metrorail station and why the government made that the most important sub-factor in this procurement. She also explained the "reasonable walking distance" standard, as follows: "GSA considers 2,500 wlf to be a reasonable walking distance from a Metro station to a federally occupied office building. If a location is further than this, it merits a lower technical rating." Ms. Kronopolous found that providing shuttle service was a mandatory requirement in the Solicitation and did not mitigate King Farm's significant distance from a Metrorail station. Ms. Kronopolous further explained the benefit of being within a reasonable walking distance, stating:

> I find that being within reasonable walking distance to the Metro provides a measurable benefit to the Government. It will allow for easier, more convenient access for commuting, will allow HHS to reduce its carbon footprint, and will allow HHS employees quick and efficient access to the Metrorail for business purposes, an important consideration for the tenant agency.

Because King Farm was located farther than 2,500 walkable linear feet from a Metrorail station, outside of a reasonable walking distance, Ms. Kronopolous determined that it warranted a "Marginal" rating on the Access to Metrorail sub-factor. Also, because it was the only offer to receive such a low rating on the most important sub-factor, weighted at thirty-five percent of the technical factors, Ms. Kronopolous concluded that the offer from King Farm was of a lower technical quality than the other four offers. She concluded that, because the Solicitation indicated that, "the importance of price decreases as the technical quality of the offers diverge from equality," King Farm's

"lower price gives it much less of an advantage over the other offers than would otherwise be the case."

Ms. Kronopolous' determination that the offer with the highest rating was not the lowest priced offeror, and thus a trade-off decision was necessary, was reasonable and consistent with the terms of the Solicitation. King Farm's offer was the only offer to receive less than a "Highly Successful" rating on the most important sub-factor, Access to Metrorail, from the Source Selection Evaluation Board, as well as the only offeror to receive lower than a "Superior" overall rating from the Source Selection Evaluation Board in its January 12, 2011 Report. Ms. Kronopolous explicitly adopted the Source Selection Evaluation Board's sub-factor ratings and overall technical ratings for each offer. In explaining King Farm's lower overall rating, Ms. Kronopolous stated that it was King Farm's significant weakness on the Access to Metrorail sub-factor that set its offer apart from the others, all of which earned a "Highly Successful" or "Superior" rating on the Access to Metrorail sub-factor.

The Solicitation stated that Access to Metrorail was the most important technical sub-factor for this procurement. It would have been difficult to conclude that the only offer to be located farther than 2,500 walkable linear feet from a Metrorail station, which was required to offer shuttle service and merited a lower technical rating than the other offers, would be the chosen offer, particularly given that, in addition to scoring highly on the Access to Metrorail sub-factor, all four of the other offers also received high ratings on the majority of the other sub-factors and receive an overall rating of "Superior." Ms. Kronopolous' decision that King Farm deserved an overall lower technical rating, that the other offers approached technical equality, and therefore, that a trade-off analysis was required, was not arbitrary or capricious.

Ms. Kronopolous' determination that King Farm warranted an overall lower technical rating than the other four offers was also a product of Ms. Kronopolous' "independent judgment," as required by FAR 15.308. The Source Selection Evaluation Board had found in both its January 12, 2011 Report and its February 3, 2011 Addendum that King Farm warranted a "Marginal" rating on the Access to Metrorail sub-factor. In its January 12, 2011 Report, the Source Selection Evaluation Board rated King Farm "Highly Successful" overall, while the other four offers received a "Superior" rating overall. The Source Selection Evaluation Board still determined, however, that King Farm represented the overall best value to the government, after conducting a trade-off analysis between King Farm and Fishers Lane, the second lowest priced offeror. In its February 3, 2011 Addendum, the Source Selection Evaluation Board changed the overall technical ratings of each of the other four offers, concluding that all five offers warranted an overall "Highly Successful" rating. Because all five offers were technically equivalent in this analysis, the Source Selection Evaluation Board found in its February 3, 2011 Addendum that no trade-off analysis was necessary and that King Farm should be awarded the contract because it was the lowest priced offer. Ms. Sias, the Source Selection Authority, found that One Largo's and University's offers deserved overall "Superior" ratings, while Fishers Lane's, Metroview's, and King Farm's offers deserved "Highly Successful" overall ratings. Ms. Sias then conducted a trade-off

analysis between the two "Superior" offers, One Largo and University, and the lowest priced "Highly Successful" offer, King Farm, and concluded that King Farm represented the best overall value to the government. In her August 24, 2011 selection decision, however, Ms. Kronopolous determined what constituted a reasonable walking distance, and noted that King Farm was the only offer that was not located within a reasonable walking distance of a Metrorail station. Ms. Kronopolous stated that King Farm's significant weakness on Access to Metrorail, the most important sub-factor, was what led to her judgment that King Farm deserved an overall lower technical rating than the other four offers. By finding both that King Farm's offer warranted a lower overall technical rating than the other four offers because of its "Marginal" rating on the Access to Metrorail factor, and that this technical inferiority overrode King Farm's lower price, Ms. Kronopolous disagreed with both the Source Selection Evaluation Board and Ms. Sias. Ms. Kronopolous exercised her own independent judgment as to how the technical distinctions between King Farm's offer and the other four offers should be weighed, and explained her decision, noting the "Marginal" rating, and the requirement that King Farm would need to provide shuttle service. Thus, her decision met the first requirement set out under FAR 15.308, namely that the source selection official use her independent judgment in making a selection decision. See, e.g., Akal Sec., Inc. v. United States, 103 Fed. Cl. at 335.

FAR 15.308 contains a second requirement: that a source selection decision must be documented, including the rationale for any trade-offs or business judgments made or relied on by the Source Selection Authority. See 48 C.F.R. § 15.308. A Source Selection Authority's selection decision, which did not meet FAR 15.308's documentation requirement, was found deficient. See FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 383. In FirstLine, the award of a contract for security screening services by the United States Department of Homeland Security, Transportation Services Administration to Akal Security, Inc. (Akal) was challenged. The FirstLine Technical Evaluation Team found that FirstLine's final proposal had thirty-three strengths and no weakness, while Akal's proposal had one strength and no weakness. Id. at 367-68. The FirstLine Source Selection Evaluation Board adopted the Technical Evaluation Team's findings, noting that both proposals received the same rating on Factor 1, identified by the solicitation as the most important, as well as on Factor 6, the least important. Conducting a trade-off analysis, the Source Selection Evaluation Board in FirstLine found that both proposals were "fully sufficient in meeting the Government's requirements," and FirstLine's proposal was only "moderately better" than Akal's proposal. Id. at 368. Therefore, according to the FirstLine Source Selection Evaluation Board, FirstLine's proposal did not warrant its substantially higher price over Akal's proposal. Id. The FirstLine Source Selection Authority's decision consisted of a short form attached to the Source Selection Evaluation Board's recommendation, which stated in full: "After consideration of the information provided to me by the technical and price evaluation members and after accomplishing an independent review and assessment of the technical and price consensus reports, I hereby determine that AKAL Security is the best value offer solution by utilizing the trade-off method." Id. at 382-83. The FirstLine court found that the source selection decision had failed "to document any business judgments or tradeoffs made or relied upon by the SSA. Indeed, the

86

statement does not even mention—much less discuss—the FirstLine proposal." Id. at 383. Because the source selection decision consisted of "nothing more than the unsupported adoption of the SSEB report, along with a conclusory assertion that" Akal's "proposal represents the best value to the government," the court held that the Source Selection Authority's decision did not meet the documentation requirement of FAR 15.308. FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 384.

In contrast, Ms. Kronopolous' determination that the offers of One Largo, Fishers Lane, Metroview, and University approached technical equality, thus, making price an important consideration in her selection decision, was reasonable, consistent with the terms of the Solicitation, complied with the requirements of FAR 15.308, and stands in stark contrast to the Source Selection Authority's decision in FirstLine. Ms. Kronopolous adopted the overall technical ratings set forth in the Source Selection Evaluation Board's January 12, 2011 Report, which rated all of the offers except King Farm as "Superior" overall. She then looked at the technical sub-factors individually and compared each of the sub-factors in each of the five offers. She found that One Largo was the strongest offer evaluated under the Access to Metrorail sub-factor, but Metroview, Fishers Lane, and University were all within a reasonable walking distance; University, Fishers Lane and King Farm were the strongest offers evaluated under the Access to Amenities sub-factor, while One Largo and Metroview were weaker; all of the offers were very technically strong on the three sub-factors comprising the Building Characteristics sub-factor; and all of the offers were highly rated with "relatively minor differences" on the Past Performance and Key Personnel sub-factors. On each sub-factor, she complied with the Solicitation's requirements regarding what features deserved higher technical ratings. Ms. Kronopolous recognized that One Largo deserved the highest rating on the Access to Metrorail sub-factor because it was the closest building to a Metrorail; distinguished between the offers with a more and a better variety of amenities under the Access to Amenities sub-factor; addressed Fishers Lane's significant weakness on the Planning Efficiency and Flexibility sub-factor, while also noting that One Largo and King Farm had minor weaknesses; and found little distinction between offers that were all rated either "Superior" or "Neutral" on the Past Performance sub-factor, and either "Superior" or "Highly Successful" on the Key Personnel sub-factor.

Based upon all of those considerations, and the relative importance of each sub-factor as assigned by the Solicitation, Ms. Kronopolous determined that the overall offers of One Largo, Fishers Lane, Metroview, and University approached technical equality. As stated above, she then went on to further explain why King Farm was not technically equivalent with the other four offers, stressing its significant weakness on the most important sub-factor, Access to Metrorail. In her August 24, 2011 selection decision, Ms. Kronopolous adopted the technical ratings set forth by the Source Selection Evaluation Board, but looked beyond those ratings to determine the distinctions between the five offers on each technical sub-factor, and she exercised her own independent judgment as to how the five offers compared to one another. She supported her rationale with a multi-page analysis comparing each of the five offers for all of the sub-factors.

After Ms. Kronopolous determined that the four offers of One Largo, Fishers Lane, Metroview, and University approached technical equality, making price an important consideration in her trade-off analysis, she conducted comparisons of the lowest priced "Superior" offeror, Fishers Lane's, with the other four offerors individually, explaining why the Fishers Lane proposal was a better overall value to the government. The section of her August 24, 2011 selection decision labeled "Parklawn v. One Largo Metro" stated, in its entirety:

> The areas of technical difference between Parklawn [Fishers Lane] and One Largo Metro are in the following sub-factors: Access to Metro, Access to Amenities, and Planning Efficiency and Flexibility.
>
> One Largo Metro is less than 525 walkable linear feet to the Largo Town Center Metro Station while Parklawn is 2,407 wlf from the Twinbrook Metro Station. One Largo Metro therefore provides very easy access to Metro, while Parklawn is further away, but within the standard walkable distance to public transportation as established in other GSA procurements. Therefore, I find that at either One Largo or Parklawn, employees will be able to conveniently get to the Metro both for commuting from/to home, and to go to meetings at other HHS locations throughout the day providing a cost savings to the Government because providing other means of transportation to the Metro and other HHS locations will not be necessary.
>
> Parklawn offers a greater variety and quantity of amenities with better hours and closer proximity than One Largo. Looking at the total number of amenities and the number of amenity categories within 2,500 walkable linear feet, it is evident that Parklawn provides ample access to various eating establishments and better access to a variety of other employee service amenities. This will allow employees multiple food choices and the ability to conduct errands, as necessary, before and after work and during their lunch breaks. While One Largo Metro has a large total number of amenities, there is a lack of variety of other employee service amenities and a duplication of amenities within amenity categories.
>
> With respect to the building's planning efficiency and flexibility, Parklawn has a significant weakness with respect to its tight column spacing. This will negatively affect space planning and flexibility in future lease years. One Largo Metro has larger column spacing; however, there are other aspects of the space planning at One Largo Metro that will have a negative effect on space planning and flexibility such as the non-uniform column spacing and the non-rectangular floor plate.
>
> One Largo Metro is $3.09 per square foot more than Parklawn, and $51,156,702 more over the life of the lease. The technical merit achieved

by the proposal for One Largo Metro with respect to Access to Metro and Planning Efficiency and Flexibility is not worth the additional cost over Parklawn because: while One Largo Metro is closer to the Metro, the distance of Parklawn to the Metro is considered by GSA to be within easy walking distance; One Largo Metro also has Planning Efficiency and Flexibility limitations such that the difference between the two offers in this sub-factor is slight.  Plus, Parklawn's rating on the Access to Amenities sub-factor exceeds that of One Largo Metro.  The much greater expense of One Largo Metro for an offer that may have a small technical advantage over Parklawn  does not represent the best value to the Government.

Ms. Kronopolous elaborated in a footnote to her decision on why she felt the difference between Fishers Lane and One Largo on the Access to Metrorail sub-factor was not great, as follows:

In assessing the real world impact of this discrepancy in distance, I came to understand, from various internet websites, that the walking speed of the average adult is between 3 and 3.5 miles per hour.  Using the lower number, it would take about 9.45 to 9.5 minutes to walk 2,500 walkable linear feet.  Therefore, most employees will be able to walk the distance from Metro to the Parklawn [Fishers Lane] building in less than 10 minutes.  In my judgment a 10 minute walk will not be a major barrier preventing employees from commuting by Metro.

Next, Ms. Kronopolous compared the offers of Fishers Lane and University.  She found that the areas of technical difference between Fishers Lane and University were the Access to Amenities, Planning Efficiency and Flexibility, Quality of Building Architecture, Building Systems, and Construction, and Key Personnel sub-factors, while also identifying where they shared the same ratings.  In terms of the Access to Amenities sub-factor, which was weighted ten percent of the technical evaluation, Ms. Kronopolous stated that, while Fishers Lane had "more than a sufficient number and variety of amenities," University, "without a doubt, offer[ed] a greater variety and quantity of amenities" and was the only offer to receive a "Superior" rating on that sub-factor, giving University an advantage over Fishers Lane.  With regard to the Planning Efficiency and Flexibility sub-factor, which was weighted fifteen percent of the technical evaluation, Ms. Kronopolous acknowledged Fishers Lane's significant weakness in terms of column spacing, and indicated that University's non-rectangular floor plan would also "negatively affect space planning and efficiency."  Ms. Kronopolous noted that Fishers Lane received a higher technical rating than University on the Quality of Building Architecture, Building Systems, and Construction because University had a significant weakness on that sub-factor.  With regard to the Key Personnel sub-factor, which was weighted five percent of the technical evaluation, Ms. Kronopolous indicated that the "technical distinction" between Fishers Lane and University was "very small." University was priced $3.15 per square foot higher than Fishers Lane, for a total of $52,442,708.00, over the fifteen-year term of the lease.  Ms. Kronopolous determined: "The minor additional technical merits of the UTC [University] offer with respect to

Planning Efficiency and Flexibility and Access to Amenities are not worth the additional cost over" Fishers Lane because University also had weaknesses on Planning Efficiency and Flexibility, and Fishers Lane had an advantage on the Building Architecture, Building Systems, and Construction sub-factor.

Comparing the offers of Fishers Lane and Metroview, Ms. Kronopolous looked at the four areas of technical difference between the two offers: the Access to Metrorail, Access to Amenities, Planning Efficiency and Flexibility, and Key Personnel sub-factors. On the Access to Metrorail sub-factor, Ms. Kronopolous calculated that, at a distance of 1,280 walkable linear feet, Metroview was about a five minute walk from a Metrorail station, while Fishers Lane was about a ten minute walk from a Metrorail station at a distance of 2,407 walkable linear feet. She found that, while Metroview was more highly rated on the Access to Metrorail sub-factor, Fishers Lane was still within a reasonable walking distance, and "[a]t either location, employees will be able to, in a short time frame, get to the Metro to commute to meetings at other HHS locations throughout the day." Fishers Lane had a distinct advantage over Metroview on the Access to Amenities sub-factor, which was weighted ten percent of the technical evaluation factors, as Fishers Lane earned a "Highly Successful approaching Superior" rating on that sub-factor, while Metroview only achieved a "Marginal" rating. With respect to the Planning Efficiency and Flexibility sub-factor, which was weighted fifteen percent of the technical evaluation factors, Ms. Kronopolous stated that Metroview had an advantage based on Fishers Lane's tight column spacing, but that Fishers Lane had a lower common area factor, which allowed for "greater flexibility and uniformity in space and furniture layout," and thus "offset[] some of" Fishers Lane's "weaknesses associated with the tighter column spacing." Finally, Ms. Kronopolous indicated that Fishers Lane was more highly rated than Metroview on the Key Personnel sub-factor. At $3.21 per square feet more than Fishers Lane, Metroview's offer would cost the government $48,380,854.00 more over the fifteen-year term of the lease than Fishers Lane's offer. Ms. Kronopolous determined that "[t]he minor technical advantage of New Carrollton [Metroview] in the Access to Amenities and Planning Efficiency and Flexibility sub-factors [was] not worth the additional cost over" Fishers Lane because Fishers Lane was within easy walking distance, the overall difference between the two offers on the Planning Efficiency and Flexibility sub-factor was small, and Fishers Lane was higher rated on the Key Personnel sub-factor, and was significantly higher rated on the Access to Amenities sub-factor. Overall, Ms. Kronopolous felt that "the much greater expense of New Carrollton for an offer that is essentially technically equivalent to Parklawn does not represent the best value to the Government."

Finally, Ms. Kronopolous compared Fishers Lane and King Farm, although she noted at the outset that King Farm's "technical inferiority" due to its "Marginal" rating on the Access to Metrorail sub-factor "overrides in significance King Farm's lower price" and a trade-off analysis between the two offers was not necessary. Nonetheless, Ms. Kronopolous looked at the two areas of technical difference between Fishers Lane and King Farm, the Access to Metrorail and Planning Efficiency and Flexibility sub-factors. Regarding the Access to Metrorail sub-factor, which was weighted thirty-five percent of the technical evaluation, Ms. Kronopolous stated that Fishers Lane "merited a higher

90

rating than King Farm" because Fishers Lane was "within reasonable walking distance," while King Farm was not. Ms. Kronopolous found that King Farm, in contrast, had a "slight technical advantage over" Fishers Lane on the Planning Efficiency and Flexibility sub-factor, which was weighted fifteen percent of the technical evaluation, because King Farm had larger column spacing than Fishers Lane, but she also noted that King Farm's column spacing was not uniform, while Fishers Lane's was, "bringing King Farm closer to technical equivalency with Parklawn [Fishers Lane] with respect to this sub-factor." Because Ms. Kronopolous determined that the difference between King Farm and Fishers Lane on the Planning Efficiency and Flexibility sub-factor was small, she noted that the real distinction between the two offers was on the Access to Metrorail sub-factor. While Fishers Lane was priced at $.92 per square feet higher than King Farm, or $39,248,188.00 more over the life of the lease than King Farm's offer, Ms. Kronopolous emphasized that Fishers Lane's price was "still markedly lower than the other Superior rated offers" of Metroview, One Largo, and University. Ms. Kronopolous concluded this part of her August 24, 2011 selection decision, as follows: "Looking to the SFO [Solicitation] standard stating that technical value is significantly more important than price, I find that while the additional technical advantage of Parklawn over King Farm *is* worth the extra increment of rent, there is not sufficient technical difference between Parklawn and the other Superior sites to justify paying the extra rent they are demanding." (emphasis in original).

Ms. Kronopolous concluded her August 24, 2011 selection decision with a summary of her trade-off analysis. She reiterated that, in choosing Fishers Lane, she was selecting the lowest priced among the "Superior" offers. She continued:

> The cost difference ($51,156,702 over the life of the lease) between Parklawn [Fishers Lane] and One Largo Metro is too great a delta to overcome the minor benefits of closer access to the Metro, especially given that Parklawn does provide convenient walkable distance to a Metro. UTC [University] is even more costly, at $52,442,708 more than Parklawn, is not even as close to the Metro as One Largo Metro, and does not, on balance, offer other technical merit worth the additional cost over the life of the lease. Additionally, New Carrollton [Metroview] also does not have sufficient technical worth to make up for the $48,380,854 additional cost over the life of the lease.

After concluding that Fishers Lane's superiority over King Farm on the Access to Metrorail sub-factor was "worth the additional cost," and determining that Fishers Lane represented the best overall value to the government after performing the trade-off analysis, Ms. Kronopolous directed the Contracting Officer to award the contract to Fishers Lane.

Ms. Kronopolous' determination that Fishers Lane's offer represented the best overall value to the government, as compared to the other offers, including One Largo, was reasonable and consistent with the terms of the Solicitation. Ms. Kronopolous looked beyond the adjectival ratings assigned to One Largo and Fishers Lane, and

directly compared the strengths and weaknesses of the two offers.  She then took price into consideration, as directed by the Solicitation, and found that One Largo's technical superiorities were not adequate to justify the $51 million price difference between One Largo's and Fishers Lane's offers.  Her determination was also consistent with the Solicitation's requirement that "the perceived benefits of the higher priced offer, if any, must merit the additional cost."  The same can be said of Ms. Kronopolous' comparisons of Fishers Lane's offer with Metroview's and University's offers.  Ms. Kronopolous exercised her independent judgment to determine whether the technical advantages of the other offers warranted their significantly higher prices over Fishers Lane's proposal.  In each case, she determined that any technical merit achieved by the other proposal did not merit the significant price difference.  Her evaluations were reasonable and consistent with the Solicitation's requirement that a higher priced offer could only be selected if its technical benefits merited its cost, given that each of the other overall "Superior" offers was approximately $48 and $52 million more expensive than Fishers Lane, for Metroview and University respectively.  Based on her analysis, Ms. Kronopolous' decision that Fishers Lane represented the best overall value to the government was not arbitrary and capricious.

Ms. Kronopolous, after reviewing the offers and evaluations, exercised her independent judgment in making her August 24, 2011 selection decision, and documented her rationale for deciding why Fishers Lane represented the best overall value to the government.  In accordance with FAR 15.308, Ms. Kronopolous used the technical evaluations performed by the Technical Evaluation Teams and the Source Selection Evaluation Board, and considered the Source Selection Authority's recommendation, when making her August 24, 2011 selection decision.  Ms. Kronopolous produced her own written selection decision, which analyzed the various strengths and weaknesses of each of the offers.  Ms. Kronopolous explained her rationale as to why the offers from One Largo, Fishers Lane, Metroview, and University "approached technical equality," while King Farm's lowest priced offer was technically evaluated as somewhat inferior, due to its lower rating on the most important sub-factor, Access to Metrorail.  She also explained why she concluded that the perceived benefits of the offers from One Largo, Metroview, and University did not warrant their higher prices, as compared to the offer submitted by Fishers Lane.  Ms. Kronopolous' discussion in her August 24, 2011 selection decision of why Fishers Lane's offer represented the best overall value to the government goes far beyond the source selection official's analysis of FirstLine's proposal in FirstLine Transportation Security Inc. v. United States, cited by Plaintiff, which consisted of one sentence and which did not even mention FirstLine's offer.  See FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. at 382-83.  In sum, Ms. Kronopolous' ultimate award determination in her August 24, 2011 selection decision that Fishers Lane represented the best overall value to the government was the product of her own independent judgment, and was adequately documented, thus, complying with both requirements of FAR 15.308.  Plaintiff has failed to meet the high burden of demonstrating that Ms. Kronopolous' trade-off analysis had no rational basis or failed to consider the relevant factors.  See, e.g., Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment upon the Administrative Record is **DENIED**. Defendant's cross-motion for judgment on the Administrative Record is **GRANTED**. Plaintiff's Complaint is **DISMISSED**. The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED**.

<u>s/Marian Blank Horn</u>
**MARIAN BLANK HORN**
**Judge**